**J. L. WILLIAMS and B. J. Chafin**

**v.**

**KAISER ALUMINUM & CHEMICAL SALES, INC.**

**Civ. A. No. CA 3–7399–E.**

United States District Court,
N. D. Texas,
Dallas Division.
April 23, 1975.

Marvin Jones, Dallas, Tex., for plaintiffs.

Patrick E. Higginbotham, Dallas, Tex., for defendant.

MEMORANDUM OPINION

MAHON, District Judge.

In this suit, J. L. Chafin and B. J. Williams (hereinafter "plaintiffs" or "Chafin and Williams"), Texas residents, seek damages arising out of an alleged breach of a lease agreement between themselves and defendant, Kaiser Aluminum & Chemical Sales, Inc., a California Corporation (hereinafter "defendant" or "Kaiser"). Plaintiffs first brought suit in the state district court and this cause was duly removed to this Court on July 2, 1973. The Court finds itself properly vested with jurisdiction pursuant to 28 U.S.C. § 1332.

The lease in question was executed for a primary term of five years on October 1, 1968 (hereinafter "lease") and covered certain commercial property located at 3420 Dalworth Street in the Great Southwest Industrial District (hereinafter sometimes "the property" or "the premises"). The property was properly used under the terms of the lease as part of Kaiser's manufacturing operation of mobile home parts. The alleged breach grew out of Kaiser's decision in 1970 to combine its Dallas and Great Southwest Industrial District facilities into one site. The proposed new facility would have had to have been large enough to house both operations. Bids were solicited from several contractors in the Dallas-Fort Worth area to construct the new building and plaintiffs were included among those invited to bid. The bid invitations made clear the fact that the package which Kaiser was seeking, included the assumption on a sublease basis, of the two older facilities which were to have been abandoned by Kaiser in favor of the new facility. Plaintiffs, Chafin and Williams, were aware of this aspect of the bidding as various correspondence between plaintiffs and defendant initiated by plaintiff show. For example, a letter from the plaintiffs to Kaiser states in pertinent part:

". . . Under this proposal, we would take over on a sublease basis,

simultaneously with your occupancy of the new facility, your present buildings as follows:

1. Building located at 2200 Carl Road, Irving, Texas, containing 33,600 square feet; covered by lease with 3 years remaining on primary term and containing two 5-year options; rental rate of $1,661 per month including taxes, insurance and maintenance.

2. Building located at 3420 Dalworth Street, Arlington, Texas, containing 40,000 square feet; covered by lease with 3 years remaining on primary term; rental rate of $2,167 per month including taxes and insurance . . .."

This letter references the two old properties whose leases are to be assumed by the successful bidder. On their own property, plaintiffs in their letter refer only to the primary term. On the other property a primary term and two five-year options are mentioned. Another letter, dated June 1, 1971, has identical language.[1] Ultimately, Chafin and Williams were unsuccessful in their bids. The instant dispute ignited over the rights of the respective parties as to the renewal and assignment provisions of the lease agreement. The applicable lease provisions provide in pertinent part:

"7. ASSIGNMENT AND SUBLETTING: Provided Tenant is not in default of any of the terms, conditions or covenants contained in this lease, Tenant may, without the consent of the Landlord, assign this lease or sublet the whole or any part of the demised premises. Any such assignment or subletting shall be subject to all the terms and conditions of this lease agreement, including the provisions of paragraph 1 hereof relating to the use of the demised premises. . . . As a

condition precedent to such subletting or assignment, the Tenant agrees to: (1) give the Landlord immediate written notice of such assignment or subletting; and (2) furnish the Landlord with an executed copy of such assignment or sublease at the time such instrument is executed . . . .."

\* \* \* \* \* \*

22. RENEWAL OPTIONS: Provided Tenant is not in default of any term, condition or covenant contained in this lease and has not assigned or sublet the leased premises, Tenant shall have the option of renewing this lease for an additional Five (5) Years years on the same terms and conditions as provided herein, . . . Notice of the exercise of such option shall be given by Tenant to Landlord in writing not later than ninety (90) days prior to expiration of the primary term hereof."

By its plain terms this language says that the lessee does not have the benefit of the renewal option (paragraph 22) if it had assigned or subleased the premises. The question presented by this case is whether or not the lessee could exercise his renewal option sometime before the end of primary term (but not less than 90 days prior to that ending) and then once the lease was effectively renewed to another five year term, exercise its right under the assignment clause (paragraph 7).

The ability to do just this was crucial to Kaiser's plans. The successful bidder for defendant's new facility, Vantage Properties, Inc. (hereinafter "Vantage") was a competitor of Chafin and Williams not only in the construction field in the Dallas-Fort Worth area, but also in the commercial building leasing market. Before Vantage would take over either of Kaiser's old facilities, they un-

---

1. The Court does not see any inconsistency in plaintiffs not referring to the renewal option contained in their own lease where they were lessors. The benefit of such an option would inure to them by their cancelling the lease.

derstandably insisted on having the benefit of the renewal term as well as the primary term of the leases. Testimony concerning the lease reflects an annual rent of 65 cents per square foot. Testimony revealed that in 1972 the annual market rate was somewhere between 90 cents and $1.10 per square foot. There is little doubt that whoever would occupy the property covered by the lease when Kaiser left, would be doing so at extremely favorable market rate.

Kaiser, by letter, advised Chafin and Williams of their intention to exercise its renewal under paragraph 22 of the lease. Evidence shows that plaintiffs had been earlier told that their bid was unsuccessful and further advised that the winning bid was tendered by Vantage. Chafin and Williams' reply on August 27, 1971, acknowledged Kaiser's right to renew under the lease provided . . . "they were not in default and had not assigned . . ." This was and is plaintiffs' contention concerning the lease. There is testimony regarding the discussions held between plaintiffs and defendant during the fall, 1971. These discussions culminated in a letter of January 5, 1972, in which defendant offered to terminate the lease. Apparently, the fall, 1971, discussions centered around whether or not Kaiser could renew and then assign its rights under the lease to the winning bidder, Vantage Corporation.[2]

Chafin and Williams' reply to Kaiser's letter is dated March 17, 1972, and is a counter offer agreeing to cancellation of the lease in consideration of six months rent. Answers to interrogatories and the testimony agree that the fall Kaiser/Chafin and Williams communi-cation were telephonic and not in writing. Testimony is conflicting on the question of when Chafin and Williams first learned Kaiser was going to attempt to exercise its renewal option and then assign the lease to Vantage. I find, however, that Chafin and Williams were placed on notice of the probability of this occurring earlier than their actual notification by virtue of their participation in the bidding process.[3]

Kaiser's version of the fall conversations was that upon being told that it (Kaiser) was renewing then assigning, Chafin and Williams said no, that Kaiser couldn't do that and anyway plaintiffs could find a tenant who would pay the full market rate. In other words, according to Kaiser, plaintiffs refused to accept Kaiser's replacement tenant and this led to the full break as reflected in the January and March letters. Chafin and Williams assert their position that they were merely holding firm in their interpretation of the lease, that is, that Kaiser was prohibited by the lease from renewing and effectively assigning.

There is disputed testimony on whether or not Chafin and Williams would have accepted their competitor Vantage as a replacement tenant for the remainder of the primary term. In any event, it is clear that they would not have been bound to accept Vantage on any other terms and conditions other than those reflected in the lease agreement. *Apex Co. v. Grant*, 276 S.W. 445, 446–47 (Tex.Civ.App.—Dallas 1925, no writ). It is also clear that Kaiser did have an absolute right to assign as to the primary term.[4]

---

2. *See* defendants' Exhibit No. 18 (letter from defendants' agent to Vantage dated November 19, 1971), wherein defendant apparently doubts that it could renew after having assigned.

3. *See*, text, *supra*. Bid proposals on this project from various concerns either reference to some extent the existence of options on one or both of the properties or they ig-

nore them. The Court concludes that in the light of industry wide practices that plaintiffs were on inquiry notice of the possibility of some competitor assuming the lease for at least the primary term.

4. Kaiser certainly could have assigned its remaining seventeen month interest in the lease to whomever it chose. Chafin and Williams were, obligated to accept Kaiser's

■ Initially, the Court concludes that Kaiser could not exercise its renewal option and then effect a valid assignment of the lease benefits to its purported assignee for the entire primary term and the renewal term. In other words, any assignment would operate only as to the primary term and would not extend over for a renewal term. The Court agrees that there is a paucity of authority on this question and is persuaded that plaintiffs' interpretation of the lease is the correct one. To hold otherwise would mean a circumvention of the clear intent of the lease instrument when viewed in its entirety. Clearly, the lease gave lessee a right to assign. This right was to have been exercised by the giving of notice, not more than 90 days prior to the expiration of the lease. Also, however, the lessee must not have been in default or have assigned the lease.[5] The interplay of the renewal and assignment option are the gist of this controversy, that is, when is a renewal effective? When does one measure default or assignment; at the time of notice or at the expiration of the primary term? The only consistent interpretation of the lease leads the Court to conclude that the proper time to measure a breach, for the purposes of determining whether or not assignment has been effected is at the expiration of the primary term. It is not inconsistent for a lessor to give an unfettered right of assignment to an unknown tenant as to a primary term and yet be unwilling to commit himself to an unknown tenant for a much longer period. The Court views Kaiser's arguments that it should be allowed to renew and then assign as an attempt to do indirectly what the lease prohibits it from doing directly.

The January through April 1972 correspondence between the parties evidences the process through which the breach developed. The breach culminated with Kaiser's wrongful vacating of the premises on or about May 1, 1972.

I conclude that as a matter of law, the circumstances surrounding the invitation for bids by Kaiser, the bidding on the new project by Chafin and Williams, the awarding of the bid to Vantage by Kaiser, and the subsequent correspondence between plaintiffs and defendant and the ultimate vacating of the premises by Kaiser amount to a breach of the lease agreement by Kaiser.

■ Kaiser next vigorously urges that plaintiffs had a duty to mitigate their damages by reletting the premises. It would have been an easy matter, Kaiser says, for Chafin and Williams to have relet the premises at the contract price for the duration of the primary term because of the dramatic upward move of market price since the execution of the agreement. Contrary to this sweeping assertion it is apparent, that in Texas, there is no general obligation on the part of the landlord when confronted with an abandonment by a lessee, to mitigate damages by procuring a new or substitute tenant. *Marathon Oil Co. v. Edwards*, 96 S.W.2d 551 (Tex. Civ.App.—Amarillo 1936, writ dism'd); *Early v. Isaacson*, 31 S.W.2d 515 (Tex. Civ.App.—Amarillo 1930, writ ref'd). Rather, it is only where there has been a reentry of the vacated premises by the landlord will a duty to mitigate be im-

sublessee under the lease. Considering conflicting testimony on whether plaintiffs actually refused to consider Vantage as a sublessee for seventeen months, the Court concludes that a reluctance on the part of Chafin and Williams to accept Vantage on any terms was demonstrated.

5. *But see* Paragraph 30 of the lease which states in pertinent part:
 " . . . Landlord . . . shall have the right to enter the demised premises during normal working hours for the following purposes: [listed] . . . If tenant shall not have served or extended this lease prior to the final one hundred twenty (120) day period of the lease term, the Landlord . . . shall have the right . . . [to place a 'For Sale' sign on the premises] . . ."

I find this provision however not to conflict with lessee's not assigning the lease after he has renewed.

posed. *Evons v. Winkler*, 388 S.W.2d 265, 269–70 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n. r. e.); *Stewart v. Kuskin and Rotberg, Inc.*, 106 S. W.2d 1074 (Tex.Civ.App.—Texarkana 1937, no writ); *See, Rohrt v. Kelley Manufacturing Co.*, 162 Tex. 534, 349 S. W.2d 95 (1961) (by implication); *White v. Watkins*, 385 S.W.2d 267, 270 (Tex.Civ.App.—Waco 1964, no writ) (by implication). Furthermore, once it is established that a duty to mitigate is present, then the burden falls on the one who caused the breach to show that losses could have been avoided by reasonable effort. *Polis v. Alford*, 273 S.W.2d 79, 80 (Tex.Civ.App.—San Antonio 1954, writ ref'd).[6] The first question thus becomes whether or not the landlord in this case has reentered and accepted a surrender.[7] The Court, when looking at the entire transactions between the parties both prior and subsequent to May 1, 1972, concludes that plaintiffs did effectuate a reentry of the premises and this reentry did give rise to a duty to mitigate damages.

Chafin and Williams' actions immediately before this surrender by Kaiser are a starting point of any consideration of any duty imposed on Chafin and Williams. In a letter to Kaiser on March 17, 1972, Chafin and Williams present Kaiser with a statement of estimated costs to bring the premises to an unspecified standard of maintenance. The total estimate is $7,224.44. A significant item is the cost of painting the offices and warehouse which is $3,274.33. This correspondence also proposes terms upon which cancellation of the lease will be acceptable to plaintiffs. These terms are six months rent plus the itemized (estimate) cost of repairs. Looking at this letter and at a letter from plaintiffs dated September 13, 1972, the true intentions of Chafin and Williams can be seen. In the September letter, plaintiffs sent Kaiser an invoice of repairs. These repairs encompass various items including removal of a temporary lunchroom added by Kaiser for their employees and also painting of the premises in the amount of $3,028.46. A December 12, 1972, letter to Kaiser explains the allocation of painting costs as being necessary because defendant had not maintained the premises as "required by the lease" and indicates that all repairs invoiced were effected with the purpose of "restoring the premises to the condition in which they were at the commencement of the lease . . ." Kaiser asserts the restoration activity of plaintiffs, the removal of the lunchroom, and the demand that the premises be brought to their original condition as being inconsistent with plaintiffs' position of no reentry. The Court agrees and so finds that these actions by Chafin and Wil-

---

6. The parties have oversimplified the question of mitigation of damages. *See e.g., Employment Advisors, Inc. v. Sparks*, 364 S.W. 2d 478 (Tex.Civ.App.—Waco) writ ref'd n. r.e. 368 S.W.2d 199 (1963). (apparently holding that there is a duty to mitigate without reentry); *See generally Early v. Isaacson*, 31 S.W.2d 515, 517 (Tex.Civ.App. —Amarillo 1930, writ ref'd); annot. 21 A. L.R.3d 534, 555–57 (1968).

7. There is some imprecision on the question of what is a reentry.

"The various courts have not explained exactly what constitutes a 're-entry' as here used. To a great extent, the definition of this term will depend upon, and be limited by, the question what constitutes a surrender of a tenancy, . . . It may generally be said that the mere acceptance of keys to the premises, or the exercise of only such dominion and control as necessary to keep the premises in repair, will ordinarily constitute neither an acceptance of an attempted surrender, nor a 're-entry' as such word is used in this annotation. The cases would seem to indicate, however, without explicitly so stating, that any greater exercise of dominion and control over the premises, and particularly the exercise of such control as is evidenced by attempts at reletting, would constitute a 're-entry'."

Annot. 21 A.L.R.3d 534, 556 n. 7. (citations omitted)

The Court finds that in this case, Chafin and Williams went far beyond the minimal steps where courts have found no reentry. *Warncke v. Tarbutton*, 449 S.W.2d 363 (Tex. Civ.App.—San Antonio 1969, writ ref'd n.r. e.).

liams were in conflict with their repeated assertions that they were not reentering.

■■ Another indication that plaintiffs did indeed effectuate a reentry is found in their extensive efforts to relet the premises, and the timing of such efforts.[8] First, there is the invoice for the printing for the lease sheets which advertise the subject property as being available. The invoice is dated April 1, 1972, thirty days prior to Kaiser's abandonment of the premises. The date of this invoice is consistent with the position that Chafin and Williams were anticipating Kaiser's leaving and were preparing in a businesslike manner for this event. The first lease flyer dated 5/72, shows that plaintiffs were making immediate efforts to relet the premises at some rate. This is the crux of the reentry question presented here. At what price were plaintiffs attempting to relet the property? The contract rate of some 65 cents per square foot, or the much greater market price of some 90 cents to $1.10? The lease flyers are silent as to any advertised price and plaintiffs assert that it was their practice not to mention price until they received prospects in response to their listings. Their argument is that they never mentioned the relatively low terms available for this property because no inquiry was ever made. This contention begs the question and supports Kaiser's position that plaintiffs reentered and were acting on their own behalf in seeking a rate higher than that called for in the lease. The Court finds that plaintiffs' efforts were directed at all times toward leasing the premises at the market rate and that they did in fact effectuate such a lease with Sealed Air Corporation to begin July 1, 1973. This effort of seeking the market rate is not in itself fatal to plaintiffs' contention of no reentry, *In Re Garment Center Capitol* 93 F.2d 667 (2nd Cir. 1938), but considered with the other circumstances present here, the Court concludes that Chafin and Williams' efforts in that direction do indicate that a reentry was effectuated as a matter of law and that plaintiffs' concern was not to relet for the account of Kaiser for the unexpired lease term but rather was for their sole benefit. Chafin and Williams offer a letter from their counsel to Kaiser dated December 12, 1972, as the first unequivocal statement of their position that they were holding defendants to the lease and were not accepting a surrender. This letter describes plaintiffs as having made "diligent efforts to lease" the property. Having failed to do so, they were now holding Kaiser in arrears for the accrued rent, other damages, and left open the total damages until the lease expiration date. This is the first clear action whereby plaintiffs attempt to show that no reentry was contemplated or effectuated. In view of Chafin and Williams' actions prior to May 1, 1972, and then subsequent to Kaiser's abandonment of the premises, the Court concludes that plaintiffs were attempting to hold Kaiser to the terms of the lease only after their efforts to relet at a more favorable rate were unsuccessful. This is too late. The actions of Chafin and Williams show that they were fully

---

8. This is not to say, however, that a lessor could not relet the premises upon abandonment by a tenant without creating a surrender. What is required is that he take proper precautions not to effect a surrender. *C. R. Miller & Bro. v. Nigro*, 230 S.W. 511, 512 (Tex.Civ.App.—Amarillo 1921, no writ). *See, Barret v. Heartfield*, 140 S.W.2d 942, 944 (Tex.Civ.App.—Beaumont 1940 writ ref'd) for statement that to effectuate a surrender there must be a meeting of the minds or mutual agreement to terminate. Of course, this does not preclude a surrender occurring as a matter of law. In the present case I find that both parties intended that a termination of their agreement occur. *Blakeway v. General Electric Credit Corp.*, 429 S.W.2d 925 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.) (cases cited therein where lessor has taken possession and does acts inconsistent with continuation of landlord/tenant relationship). I find that except for their own declarations the actions of plaintiffs subsequent to the breach by Kaiser were inconsistent with any situation but a reentry.

prepared for defendant's action in abandoning the premises and were contemplating other motives, i. e., reletting the property at a higher price, rather than insisting upon their rights under the lease. *Compare, Warncke v. Tarbutton,* 449 S.W.2d 363 (Tex.Civ.App.—San Antonio 1970, writ ref'd n. r. e.) (lessor merely placed padlock on the building, boarded it up for protection and placed "for rent" sign on building.) In the case *sub judice,* plaintiffs were actually seeking a new position by bringing the premises back to its original condition and by taking steps to relet the premises prior to its being vacated by lessee. The evidence in this case shows that the efforts of Chafin and Williams were directed toward securing a tenant at the more favorable market price rather than mitigating damages or insisting on their rights under the lease. The fact that this decision was a sound business judgment is apparent even though the property remained vacant for a period of fourteen months, because in July 1973, the premises were leased to a new tenant for a term of ten (10) years at an annual rent of approximately $1.06 per square foot.[9] This lease provides for the first three months to be rent free to the tenant. This was described by the plaintiffs as being "an incentive to consummate the lease." That it might be so is not doubted, but the Court concludes that in doing so Chafin and Williams demonstrated one more manner in which they considered the lease to be terminated as to Kaiser.[10] Considered against the relationship between the parties prior to the May 1 leaving date by Kaiser, I conclude that these actions constituted a reentry by Chafin and Williams. *Blakeway v. General Electric Credit Corp., supra.* This reentry in turn gives rise to a duty to use reasonable diligence to relet in order to mitigate damages. *Stewart v. Kuskin & Rotberg, Inc., supra.* The evidence is clear that in the late Spring and early Summer 1972 the market rental rate for property similar to the premises was much higher than the contract rate; that Vantage would have taken the property for the remainder of the contract period for some rate at or near the contract price and that plaintiffs were unwilling to allow their competitor Vantage have the premises for any rate.[11,12] In this situation, Chafin and Williams upon their reentry were acting in a manner consistent with the lease being declared at an end. They cannot once having done this, turn and attempt to hold their

9. Defendant's Exhibit No. 30, lease between plaintiffs and Sealed Air Corporation dated June 22, 1973. This lease provides for an annual rent of $42,399.96. This figure divided by the area of the premises gives approximately $1.06 per square foot. This lease also changes the language of the renewal option clause (Paragraph 22) to conform more clearly with plaintiffs' interpretation of it in the present lawsuit.

10. An original contention by plaintiffs in this lawsuit, was a claim for three months rent for July, August, and September 1973. This period of course was given away by Chafin and Williams to their new tenant. The claim for these rentals was abandoned at the trial.

11. This is in spite of some testimony that there were some vacancies in the area at this time. During this time period, Chafin and Williams leased a similar sized building for some 94 cents per square foot. Acknowledging location dissimilarities, the Court notes that where there is a great disparity in contract price and market like is presented here reasonable diligence will include efforts to lease the property at or near the contract price. Otherwise, there will be an insurmountable temptation for a lessor in such circumstances to never make an election but rather "shop" for market rates with the longest possible term with lessees bearing the risk.

12. There was no obligation however for Chafin and Williams to accept Vanatage on terms which varied the original lease. *Apex Co. v. Grant, supra.* For example, testimony from a Vantage representative shows that it would have definitely taken the property for five years at a rate up to 80–85 cents. Now, although plaintiffs were not obligated to take Vantage on these terms; the Court takes this evidence to show that there was a market for the property at the contract rate for the seventeen months remaining on the lease. *See* note 11, *supra.*

former lessee accountable. To allow plaintiffs to do so would permit them to take unfair advantage of a situation which they helped fashion. I find that the reentry did not however, occur until after their claims for restoration of the premises back to the original condition and accelerated taxes had matured. These claims are not obviated by the failure of plaintiffs to mitigate damages as they were required to do. Accordingly, it is ordered that judgment be entered against defendant Kaiser in the amount of the cost to bring the premises back to the original condition as shown in Plaintiffs' Exhibit 11 and the accelerated taxes shown therein. Plaintiffs' counsel will submit a proposed order for judgment consistent with this opinion and reflecting that defendant Kaiser will bear costs of these proceedings.

It is so ordered.