MBC, INC., Plaintiffs and Counterdefendants-Appellees, v. SPACE CEN-
TER MINNESOTA, INC., *et al.*, Defendants and Counterplaintiffs-Appel-
lants (Space Center, Inc., Defendant and Cross-Appellee; Mortimer Develop-
ment Company, Counterdefendant).

First District (3rd Division)   No. 86—0338

Opinion filed May 4, 1988.—Rehearing denied December 6, 1988.

McNAMARA, J., dissenting.

A. Daniel Feldman, Donald V. Jernberg, and Edward R. Gower, all of Chicago (Isham, Lincoln & Beale, of counsel), for appellants.

Philip W. Tone, Robert C. Keck, and Don R. Sampen, all of Jenner & Block, of Chicago, for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

This litigation arises from the sale of a commercial warehousing business, Crooks Terminal Warehouse, by plaintiff, MBC, Inc. (MBC), to defendant Space Center Minnesota, Inc. (SCM). The business consisted of three large buildings in and around Chicago used as distribution centers by major food products manufacturers and retailers. After a bench trial, the circuit court of Cook County made written findings of fact and conclusions of law on which it based its judgment for MBC.

On appeal, SCM contends: (1) the trial court erred in concluding that SCM had waived a condition precedent to its performance by proceeding to close the transaction; and (2) MBC's damages should be reduced due to its failure to exercise reasonable diligence to mitigate damages. MBC cross-appeals, contending that the trial court erred in failing to enter judgment against SCM's corporate parents and that its damages should be increased.

The parties' contract, dated November 10, 1980, provided for the purchase of the assets of the business and a sublease of, and partial purchase option on, the real estate it occupied. The real estate was owned by the Mortimer Development Company, the corporate parent of MBC. The leases and sale were closed on December 31, 1980. SCM suspended part of its performance one month later, stating that it was concerned about large shortages of customer goods. After negotiations failed to resolve the problem, SCM suspended all payments under the contract on March 1, 1981. On March 20, 1981, SCM sent MBC notice of its rescission of the contract, effective March 31, 1981.

SCM cited lost goods and the unhappiness of customers whose claims therefor had not been settled by MBC prior to the closing as reasons for the rescission. MBC declined the return of the business, stating that under the lease it was entitled to the return of empty buildings. Thereafter, SCM consolidated into one building the goods remaining after several of its larger customers departed, leased that building from MBC at a higher rental rate than provided in the original sublease and surrendered the two empty buildings to MBC.

On April 2, 1981, MBC filed a forcible entry and detainer action against SCM. The trial court awarded MBC possession of the two empty buildings on July 2, 1981. MBC's amended complaint sought, *inter alia*, sums owed by SCM under the contract for equipment and a noncompetition covenant and damages for breach of the sublease. SCM's counterclaim sought, *inter alia*, rescission of the contract on grounds of misrepresentation, failure to disclose, and fraudulent concealment of, material facts regarding claims by warehouse customers for inventory shortages existing before the closing date. The counterclaim also alleged that the misrepresentations and failure to disclose constituted a breach of a condition precedent, thereby relieving SCM of its duty to perform under the contract.

In paragraph 14n of the contract, MBC represented and warranted that to the best of its knowledge there were sufficient goods in the warehouse to satisfy its obligations under existing warehouse receipts and storage contracts except for those situations listed in exhibit G to the contract. It also represented and warranted, *inter alia*, that: (1) to its knowledge there were no suits pending or threatened in excess of $15,000 against it by any warehouse customers other than the matters listed in exhibit G, which were adequately covered by insurance; and (2) to the best of its knowledge no customers were planning to leave. Paragraph 17a made the truth of both parties' representations/warranties as of the closing date a condition precedent to the closing of the sale and required the exchange of certificates to that effect.

Exhibit G-2 to the contract provided, *inter alia*, that: (1) shortages in the inventory of Borden Company's products in the alleged amount not in excess of $250,000 had recently arisen; (2) there was an alleged $38,000 shortage in the seafood division of Castle & Cooke's products; and (3) as a result of a November 1, 1980, audit there might be a shortage in the Hoover Company's inventory which MBC had not yet audited.

In paragraph 15f, SCM covenanted that it was to use its best efforts to investigate and inspect MBC's business and property within.

21 days of November 10 to determine the accuracy of MBC's representations, warranties and covenants. For that purpose, in paragraph 15f, MBC also gave SCM full access during normal business hours from November 10 to December 31, the closing date, to all of its property, books, contracts and records and agreed to furnish SCM with all information concerning the business which SCM reasonably requested. Paragraph 15f further provided that, if SCM's investigation resulted in findings materially inconsistent with MBC's representations, warranties and covenants, it was to give MBC a detailed, written list of its findings within the 21-day period to allow MBC time to cure any breach prior to closing. Immediately thereafter, paragraph 15f also provided: "This provision shall not limit any remedies *** available to buyer in the event a breach is found in [MBC's] representations, warranties or covenants *** after expiration of" the 21-day period.

▇ SCM first contends it did not waive the condition precedent that MBC's representations of the sufficiency of customer goods be true as of the closing date. The findings and conclusions of the trial court at issue are that: (1) SCM, rather than making a best-efforts investigation of possible shortages of which it was apprised, chose to rely on MBC's volunteering its information concerning the shortages without complete inquiry of MBC's records, customers or insurance carriers; (2) it was a reasonable inference from SCM's conduct that the "announced possible shortages were not material to the bargain until after the transaction was closed"; and (3) SCM waived the subject condition precedent by closing the transaction after being put on notice of possible shortages in customer goods.

SCM cites a plethora of facts allegedly showing the materiality to it of the condition precedent and that it had neither the actual nor constructive knowledge of the truth of MBC's representations necessary for a finding of waiver of the condition. Likewise, MBC cites a plethora of facts allegedly showing that the condition was immaterial to SCM or that it had either the actual or constructive knowledge necessary for a finding of waiver. For the sake of brevity, we will cite and discuss only those facts, as well as the law, which we believe are dispositive of this issue.

SCM does not appeal from the trial court's ruling that MBC committed no fraud in respect of the transaction between the parties. However, we believe the factual findings and the law upon which the trial court relied for that ruling are also relevant to the issue whether SCM waived the subject condition precedent.

In addition to the foregoing factual findings and legal conclusions,

the trial court also found the following with respect to the shortages in customer goods: (1) it was unrefuted that the preclosing shortage in the Borden account never exceeded $250,000 and that MBC did not learn more about any shortages in the Hoover account than it disclosed in exhibit G-2, *i.e.*, that "there may be a shortage" in that account; (2) there was no proof that any shortages in Jewel's or Folgers' account arose from inventories taken prior to closing; (3) one of MBC's inventory clerks was notified of a possible claim by Castle & Cooke for a shortage of 5,000 cases of tuna fish on December 1, 1980; (4) Arthur Klawans, the president of the warehouse under both MBC and SCM informed Roger Carlson, the president and a director of SCM, of the Castle & Cooke's 5,000-case shortage of tuna fish on December 1, 1980, although Carlson denied receiving the call; (5) John Pastor, an employee of the warehouse under both MBC and SCM, informed James Keyes, an employee of SCM, of a possible shortage of as much as 5,000 cases in Castle & Cooke's inventory that might be due to a computer error, but SCM did not investigate the matter further; (6) Keyes admitted that Klawans might have discussed this shortage with him on December 9 and that Pastor did discuss it with him on December 22; (7) Keyes also informed Carlson of this shortage after his discussion with Pastor but Carlson expressed no concern over it; (8) MBC made its files, inventories, correspondence, worksheets, count sheets and inventory records available to SCM before closing.

Based on these factual findings, which SCM does not contest as against the manifest weight of the evidence, and the evidence underlying them, we conclude the trial court did not err in finding that SCM had waived the subject condition precedent. As the supreme court has stated and as the trial court, in part, noted:

> "As a general rule one who is guilty of fraudulent misrepresentation cannot interpose a defense that the person defrauded was negligent in failing to discover the truth. [Citation.] The general rule is subject to the qualification, however, that the party seeking relief had a right to rely upon the representation made. [Citation.] This court has pointed out accordingly that 'In all cases where it is sought to hold one liable for false representations, the question necessarily arises, whether, under all circumstances, the plaintiff had a right to rely upon them. In determining this question, the representations must be viewed in the light of all the facts of which plaintiff had actual notice, and also of such as he might have availed himself by the exercise of ordinary prudence.' [Citation.] The rule is well estab-

lished that a party is not justified in relying on representations made when he has ample opportunity to ascertain [their] truth \*\*\* before he acts. When he is afforded the opportunity of knowing the truth of the representations he is chargeable with knowledge; and if he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations." (*Schmidt v. Landfield* (1960), 20 Ill. 2d 89, 94, 169 N.E.2d 229.)

Case law has not been entirely consistent on the issue of justifiable reliance in fraud cases. (See *Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 454 N.E.2d 723 (and cases cited therein).) However, even that case recognized that " '[t]he plaintiff's conduct must not be so unreasonable, in light of the information open to him, that the law may properly say that [his] loss is his own responsibility.' " *Chicago Title & Trust*, 118 Ill. App. 3d at 409, quoting Prosser, Torts, §108 at 715 (4th ed. 1971).

Here, not only did SCM have opportunities to learn the truth of MBC's representations, it also had the contractual duty to do so. Paragraph 15f of the contract provided, *inter alia*: (1) MBC gave SCM full access to MBC's property, books, contracts and records to confirm its representations, warranties and covenants; (2) SCM was to use its best efforts to investigate MBC's business and property within 21 days to determine the accuracy of those representations, warranties and covenants; (3) SCM was to give MBC a written list of any findings materially inconsistent with MBC's representations before the end of the 21-day period to allow MBC to cure any breach prior to closing; (4) these provisions did not limit SCM's remedies were it to find a breach by MBC after that period.

In view of the applicable law, the facts available to SCM and SCM's contractual duty to use its best efforts to determine the truth of MBC's representations prior to the closing, the trial court ruled that SCM had not made out a case of fraud.

As to whether it waived the subject condition precedent, SCM relies, *inter alia*, on the fact that, under paragraph 15f, it was entitled to discontinue its performance if it discovered a breach of the condition precedent after the date of closing to argue that proceeding to close the transaction was not a waiver of the condition. However, we do not believe that this provision entitled SCM to ignore its contractual duty to use its best efforts to determine the truth of plaintiff's representations before that date. Rather, SCM's right to rely on this provision depended, we believe, on a good-faith effort to fulfill that duty under the contract. Rather than make that effort, however,

SCM, as the trial court found, chose to rely on MBC to volunteer information regarding shortages of customer goods without any inquiry into MBC's records or of its customers or insurers. We conclude that, whether or not the trial court correctly ruled that possible shortages were not material to SCM before the closing date, its dispositive ruling that SCM waived the condition precedent by closing the transaction was correct.

Waiver is an intentional relinquishment of a known right. (*Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449, 461, 323 N.E.2d 521.) Contracting parties can waive any provision in the contract and such waiver is often demonstrated by conduct indicating that strict compliance with the contract provisions will not be required. (*Swerdlow v. Mallin* (1985), 131 Ill. App. 3d 900, 904, 476 N.E.2d 464.) In this case, SCM proceeded to close the transaction in the face of: (1) sufficient information to put it on notice that MBC's representations were possibly inaccurate; and (2) its own failure to conduct a best-efforts investigation to determine the accuracy of those representations. That conduct conclusively demonstrated that SCM did not require of MBC strict compliance with the condition precedent. Therefore, SCM waived the condition and could not subsequently rely on it to justify its failure to perform under the contract.

Moreover, because the condition precedent required that MBC's representations be true as of the closing date, the trial court correctly focused on SCM's conduct up to that point in determining the waiver issue. This conclusion is buttressed by the contract requirement that SCM give MBC notice prior to the end of the 21-day investigation period of any material inconsistencies in its representations found upon a best-efforts investigation to allow MBC to cure any breaches by the closing date. This provision makes clear that, while the discovery of any breaches after the closing date would allow SCM to seek some remedy, the parties were primarily concerned with breaches discovered prior to and by the closing date. As such, the trial court correctly concluded that SCM waived the condition precedent by closing the contract.

Finally, we reject SCM's contention that its conduct in proceeding to close the transaction was commercially reasonable, although that is not the legal issue before us. We do not believe it is commercially reasonable for the purchaser of an ongoing warehouse concern in an arms-length transaction to proceed to consummate the transaction in the face of its failure to meet its obligations, and to avail itself of ample opportunities, to satisfy itself of the truth of the vendor's representations. Having done so notwithstanding those failures, such a pur-

chaser cannot be heard to complain that the facts of the transaction were not as it assumed them to be.

■■ SCM next contends MBC breached its duty to attempt in good faith to mitigate its damages once SCM rescinded the contract. SCM alleges, *inter alia,* that MBC instead attempted to profit from SCM's abandonment of the warehouses by seeking higher rents for them than were due under the parties' sublease. SCM concludes that MBC's damages are limited to those incurred until MBC elected to profit from SCM's abandonment rather than merely mitigate its damages, *i.e.,* approximately $464,000.

MBC asserts, *inter alia,* that in Illinois a lessor has no duty to mitigate damages when a tenant abandons a leasehold. As such, it reasons, its duty to relet was defined only by the contract, which gave it sole discretion to determine the term and conditions of any reletting.

The sublease between the parties provided:

> "Upon *** Lessor's entry into possession without termination of this Lease, Lessor may, and shall use its reasonable efforts, to relet the premises or any part thereof *** for such rent, for such term and upon such conditions as Lessor in Lessor's sole discretion shall determine and Lessor shall not be required to accept any lessee offered by Lessee (provided that such acceptance shall not be unreasonably refused) ***."

On this aspect of the case, the trial court found the following. In effecting its duty to use reasonable efforts to relet the premises, which arose under the sublease with SCM, and its duty to mitigate damages, MBC made no effort to relet the premises at the identical rate provided in the subleases with SCM for the balance of the lease terms. Instead, it offered to relet the 73rd Street Warehouse at a rate of $2.10 per square foot rather than the $1.30 per square foot provided in SCM's lease and it offered the Kostner Avenue warehouse at $1.95 per square foot rather than the $1.30 per square foot for the first two years of SCM's lease or the $1.40 per square foot for the third year of that lease. MBC's real estate broker recommended the higher rental rates it sought.

The trial court also found the following. MBC began its reletting efforts in advance of its actual possession of the Kostner Avenue and 73rd Street warehouses. The Kostner Avenue warehouse was relet to the "first serious prospect" at almost the identical rate SCM had agreed to pay. MBC relet the 73rd Street warehouse on a partial, expandable basis two months after it regained possession of the buildings. MBC ultimately negotiated a long-term lease for the 73rd Street

warehouse with the first suitable prospective tenant it found. MBC agreed to a rental rate for the first 11 months of that lease which was less than the rate SCM had agreed to pay. Based on these findings, the trial court concluded that MBC's efforts to relet were reasonable and that it was thus entitled to its actual damages.

We disagree with the trial court that MBC's efforts to relet the abandoned warehouses and thereby mitigate its damages were reasonable. Rather, we hold that, as a matter of law, MBC's failure, as found by the trial court, to offer the warehouses to any prospective tenant on the same terms as the sublease with SCM and its efforts to secure subleases of the warehouse at rents considerably higher than due under the sublease with SCM constituted a breach of its duty to exercise reasonable diligence to mitigate damages.

In so concluding, we note that a reviewing court may not disturb a trial court's finding as to damages unless it is against the manifest weight of the evidence. (*Dale v. Luhr Brothers, Inc.* (1987), 158 Ill. App. 3d 402, 410, 511 N.E.2d 933.) However, we also note that it has been stated that, to uphold a contention that a damage award is contrary to the manifest weight of the evidence, it must be found that the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law. (*Vee See Construction Co. v. Luckett* (1981), 102 Ill. App. 3d 444, 447, 430 N.E.2d 91; see also *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 413 N.E.2d 1299.) This latter standard is the one we apply in reaching our conclusion.

Preliminarily, we must address MBC's contention that under Illinois law its duties in reletting the warehouses were defined solely by the sublease.

The law in Illinois on the issue of a landlord's duty to mitigate his damages upon a tenant's abandonment of leased premises was unsettled at the time of the subject transaction. (*Chicago Title & Trust Co. v. Hedges Manufacturing Co.* (1980), 91 Ill. App. 3d 173, 175-76, 414 N.E.2d 232.) The modern trend of no general duty to mitigate (*Chicago Title & Trust Co.*, 91 Ill. App. 3d at 176) notwithstanding, we believe this case is governed by *Harmon v. Callahan* (1919), 214 Ill. App. 104, which construed the effect of a lease provision strikingly similar to that at issue here. *Harmon* involved a lease which provided that upon the lessee's abandonment or vacation of the leasehold premises, they "shall be relet by [the landlord] for such rent, and upon such terms as [the landlord] may see fit." (*Harmon*, 214 Ill. App. at 107.) The court recognized that a landlord generally has no duty to mitigate damages by reletting premises upon a tenant's abandonment.

(*Harmon,* 214 Ill. App. at 108-09.) Nonetheless, the court held that the lease bound the landlord to exercise reasonable diligence to relet the premises. *Harmon,* 214 Ill. App. at 110.

In the instant case, MBC reserved the right upon reentry "to relet the premises or any part thereof *** for such rent, for such term and upon such conditions as [MBC] in [its] sole discretion shall determine." Given the similarity of this language to that at issue in *Harmon,* we believe that *Harmon* imposed upon MBC a duty to exercise reasonable diligence to relet the warehouses vacated by SCM and that, as in *Harmon,* that duty was not limited in any manner by MBC's reservation of discretion to determine the rent, term, and other conditions of any reletting. We do not agree with SCM, however, that MBC's efforts to sell the warehouse buildings terminated SCM's liability for rent. *Harmon,* which SCM cites for that rule, merely held that the lessor's representations to prospective tenants that she wanted to sell the property created an issue of fact as to whether she had exercised reasonable diligence in reletting the premises. *Harmon,* 214 Ill. App. at 110.

Having determined that MBC's duties in reletting the warehouses were not determined solely by the sublease, we next address the reasonableness of its reletting efforts.

In *J.L. Williams v. Kaiser Aluminum & Chemical Sales, Inc.* (N.D. Tex. 1975), 396 F. Supp. 288, the defendant-lessee contended the plaintiffs-lessors had a duty to mitigate their damages by reletting the abandoned premises at the contract rate of 65 cents per square foot for the duration of the initial term of the lease. It argued that easily could have been done in view of the increase in the market rate for the property to between 90 cents and $1.10 per square foot at the time it abandoned the premises. The court concluded that the lessors' duty to use reasonable diligence to relet the premises in order to mitigate damages arose upon their reentry into the premises. *J.L. Williams,* 396 F. Supp. at 293, 295.

■ MBC's duty to exercise reasonable diligence to relet the warehouses and thereby mitigate its damages arose out of the language of the lease and the law applicable thereto, *viz., Harmon,* not, as in *Williams,* out of a reentry of the abandoned premises. However, we believe that circumstances which the *Williams* court relied upon to find a reentry therein are relevant here insofar as they also reveal the reasonableness of MBC's efforts to relet the warehouses. Those circumstances included the plaintiffs' efforts to relet the premises at the higher market rate rather than the contract rate. Those efforts, the court concluded, indicated that the lessors' concern was not to relet

for the lessee's account and that the lessors were not insisting upon their rights under the lease but were attempting to relet for their sole benefit. Significantly, that the lessors' efforts also reflected "a sound business judgment" did not alter the court's conclusion. (*J.L. Williams*, 396 F. Supp. at 295.) The court reasoned that, where there is a great disparity in contract and market rates, reasonable diligence to mitigate damages includes efforts to lease the property at or near the contract rate. *J.L. Williams*, 396 F. Supp. at 295, n.11.

Similarly, in *Consolidated Sun Ray, Inc. v. Oppenstein* (8th Cir. 1964), 335 F.2d 801, the defendants-lessees contended the plaintiff-lessor had not been reasonably diligent in reletting the premises and thus mitigating damages in that he offered the premises at a much greater rental rate than defendants were paying. The district court ruled as a matter of law that the plaintiff had no duty to mitigate damages. The court of appeals reversed. It held there was an issue of fact as to whether the plaintiff had chosen to remain out of possession of the premises, treat the lease as subsisting and recover rent from the defendants or, instead, to reenter, resume possession in his own right and treat the lease as terminated. Specifically, the court observed: "If [plaintiff] were acting as an agent for [defendant] *** he would not, in good faith, have been justified in demanding a rental in excess of what [defendant] owed. A reasonable inference from [plaintiff's] exorbitant demands—far greater than the provisions of the lease called for—is that he had resumed possession in his own right and not as an agent for [defendant]." *Consolidated Sun Ray, Inc.*, 335 F.2d at 811.

In *Mar-Son, Inc. v. Terwaho Enterprises, Inc.* (N.D. 1977), 259 N.W.2d 289, the trial court ruled that the plaintiff-lessor's attempt to lease previously abandoned premises for $12,600 more per year than due from the defendant-lessee was not a good-faith effort to mitigate damages. The trial court thus limited the plaintiff's damages to those incurred while the plaintiff continued its good-faith efforts to mitigate damages. The North Dakota Supreme Court affirmed, stating: "If seeking a higher rent inhibits the re-rental of the premises, it cannot be found to be in good faith." *Mar-Son, Inc.*, 259 N.W.2d at 292.

The reasoning of these cases is cogent and persuasive. Conversely, MBC's attempt to distinguish them on the basis of allegedly inapplicable law or differing lease provisions is not. Under these cases, reasonable diligence to mitigate the damages due from SCM required MBC to offer the warehouses for the remainder of the term of SCM's lease at the rental rates due from SCM. As MBC chose instead, as revealed by the evidence, to profit for its own account by seeking much higher

rents for the warehouses, it is entitled only to the damages incurred before it was awarded possession of them. That the higher rentals which MBC sought were recommended by its real estate broker and thus arguably reflected a sound business judgment does not alter this conclusion. The evidence adduced at trial revealed that MBC incurred damages of $462,408.40 as a result of SCM's abandonment of the warehouses. Therefore, the judgment of the trial court for MBC is affirmed and the award of damages is hereby reduced to $462,408.40. 107 Ill. 2d R. 366(a)(5).

▆ In its cross-appeal, MBC contends the trial court erred in failing to pierce the corporate veil and to enter judgment against SCM's parent, Space Center, Inc., and that it is entitled to an additional $531,726 in damages. After a review of the record, we conclude the trial court's refusal to pierce the corporate veil was not against the manifest weight of the evidence. Finally, having determined that MBC's damages must be reduced due to its failure to exercise reasonable diligence to mitigate damages for the account of SCM, we need not address its claim for additional damages.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed in part, reversed in part and the damage award to plaintiff, MBC, Inc., is reduced to $462,408.40

Affirmed in part and reversed in part.

RIZZI, J., concurs.

JUSTICE McNAMARA, dissenting:

I agree with the majority that the trial court correctly concluded that defendant waived the condition precedent by closing on the contract. However, I respectfully dissent from the majority's decision to reduce the damages awarded to plaintiff based on its finding that plaintiff's efforts to relet the premises were unreasonable.

In 1984, Illinois enacted a statute requiring a landlord or his agent to take reasonable measures to mitigate the damages recoverable against a defaulting lessee. (Ill. Rev. Stat. 1985, ch. 110, par. 9—213.1.) Prior to that time, however, including the period governing the action in this case, if a lessee abandoned or vacated the premises, the landlord was not necessarily required to mitigate by reletting the premises, absent a lease or contract provision so requiring. (*Harmon v. Callahan* (1919), 214 Ill. App. 104.) The overall trend was that there was no general obligation to mitigate but only a duty to accept a suitable subtenant when offered. (*Chicago Title & Trust Co. v.*

*Hedges Manufacturing Co.* (1980), 91 Ill. App. 3d 173, 414 N.E.2d 232; *In re Estate of Conklin* (1983), 116 Ill. App. 3d 426, 451 N.E.2d 1382.) The sublease between the parties in the present case required that plaintiff use "reasonable efforts" to relet. It further provided that the reletting would be "for such term and upon such conditions as Lessor in Lessor's sole discretion shall determine."

I disagree with the majority that plaintiff's obligation to relet was determined by anything more than the language of the sublease. I believe that plaintiff's obligation herein arose solely under the lease provision requiring that it use reasonable efforts to relet. *Harmon*, the case relied on by the majority, does not impose a general duty of reasonableness to relet abandoned or vacated premises. *Harmon* clearly held that the facts of that case distinguished it from the general rule of no duty to mitigate and it was the express terms of the contract which bound the landlord to exercise reasonable diligence to relet the premises. Notably, the contract at issue in *Harmon* contained language similar to the contract in the present case retaining for the plaintiff the discretion to determine the rent, terms and other conditions of any reletting. *Harmon* did not discuss the effect of this reservation of discretion. The court in *Harmon* remanded because the averments made therein created issues of fact. Therefore, I find the *Harmon* decision to be of little value as an analogous case which would aid this court in determining the reasonableness of plaintiff's efforts based on its obligation under the contract.

The majority acknowledges that a reviewing court should not disturb a trial court's finding and substitute its own decision unless the trial court's finding is against the manifest weight of the evidence. The rule that the findings of a trial court sitting without a jury will not be disturbed unless manifestly erroneous has been applied by our supreme court to the assessment of damages. *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323.

As its standard of review, the majority states that to uphold a decision as contrary to the manifest weight of the evidence, it must be found that the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law. Notably, neither case cited by the majority found that the trial court ignored the evidence or error in the measure of damages as a matter of law. *Vee See Construction Co. v. Luckett* (1981), 102 Ill. App. 3d 444, 430 N.E.2d 91; *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 413 N.E.2d 1299.

In the present case, I do not believe that the trial court ignored the evidence or that its measure of damages was erroneous as a mat-

ter of law. Conversely, I believe that the trial court's award of damages is amply supported by the evidence. Plaintiff gained possession of the warehouses on July 2, 1980. Plaintiff began its efforts to relet in advance of possession. Plaintiff secured a broker and sought higher rental rates upon the recommendation and advice of this broker. The Kostner Avenue warehouse was relet to the first serious prospect at almost the identical rate defendant was to have paid. Plaintiff's 73rd Street warehouse was partially rented two months after plaintiff regained possession of the building. Plaintiff ultimately negotiated a long-term lease for the 73rd Street warehouse with the first suitable prospective tenant it found. Plaintiff agreed to a rental rate for the first 11 months that was less than the rate defendant was to have paid. Furthermore, defendant never offered plaintiff a prospective sublessee, an alternative clearly contemplated by the sublease. Pursuant to its sublease with defendant, plaintiff was precluded from unreasonably refusing a sublessee offered by defendant.

Defendant maintains that plaintiff's failure to accept a proposal from Couzens for rental of the 73rd Street warehouse was a clear failure of plaintiff's duty to mitigate. While the price per square foot offered by Couzens would have greatly reduced the damages available against defendant, plaintiff was not unreasonable in rejecting the proposal. The proposal from Couzens offered lower rates than defendant was to pay for the first two years of the sublease. The Couzens proposal also differed from defendant's terms in respect to the duration of the lease, certain options and the assumption of obligations. While Couzens was never offered the exact terms of defendant's lease, the lease which bound plaintiff to act reasonably also gave plaintiff discretion in determining terms and conditions of a sublease. The trial court was entitled to find that plaintiff's decision not to accept Couzen's proposal was a reasonable one.

The majority relies on several cases from other jurisdictions where landlords' efforts to mitigate were found unreasonable based upon attempts by these landlords to relet at rental rates higher than those to have been paid by the breaching tenants. In the present case, the rental rates sought by plaintiff after taking possession of the warehouses were based upon the recommendation of its real estate broker. Furthermore, the subleases actually acquired by plaintiff were for rates very close to the rates defendant was to have paid. Plaintiff sought the best rate in the shortest time possible and, as the trial court found, such efforts cannot be said to be unreasonable. I therefore find the cases relied upon by the majority to be unpersuasive.

Based on the evidence, I cannot say that the trial court ignored

240

the evidence or that its measure of damages was erroneous as a matter of law. Nor can I say that the decision of the trial court finding plaintiff's efforts to relet were reasonable was against the manifest weight of the evidence. I would affirm the trial court's award of damages.