JAMES DALE, Plaintiff-Appellee, v. LUHR BROTHERS, INC., Defendant-Appellant.

Fifth District   No. 5—86—0583

Opinion filed July 29, 1987.—Rehearing denied August 18, 1987.

404

Daryl F. Sohn and John R. Halpern, both of Goldstein & Price, of St. Louis, Missouri, for appellant.

Cook, Shevlin & Keefe, Ltd., of Belleville (Bruce N. Cook, of counsel), for appellee.

JUSTICE WELCH delivered the opinion of the court:

Plaintiff James Dale commenced this Jones Act (46 U.S.C. sec. 688 (1983)) case in St. Clair County. After a bench trial, the judge found defendant Luhr Brothers, Inc., liable to plaintiff in the amount of $1,654,704. Defendant appeals. There is no cross-appeal.

Defendant employed plaintiff as a heavy machinery operator. Plaintiff spent about half his employment for defendant on land and the other half on the water. At the time of his injury plaintiff was in his second week as the second-shift dragline operator on the L1000, a 150- to 175-foot-long spud barge engaged in revetment at a construction site on the Illinois bank of the Mississippi River. Since beginning this two-week period plaintiff had no other duties. His work week as dragline operator consisted of six 10-hour days a week. According to the record, the chief difference between a dragline and a crane is that a dragline's bucket is affixed to the boom by cables rather than by a rigid connection. Revetment, or erosion control, in this case consisted of riprapping or paving the riverbank with rock. The L1000 was called a spud barge because of the spuds which held the barge in place on the river bottom. The L1000 was equipped with a winch house and a portable toilet. The remainder of the crew of the L1000 consisted of an oiler responsible for maintenance of the dragline, plus a winchman who controlled the spuds and a laborer who kept the L1000 clean, tied off rock barges brought by a tugboat and "switched out the empties." Plaintiff handled no lines, did not clean or maintain the barge, did not repair leaks or perform any pumping, and did not raise or lower the spuds when the L1000 was moved. When plaintiff worked on the L1000 he ate and slept at home, except for the mid-

shift meal, which he generally ate on the L1000. The dragline was not affixed to the deck of the L1000. It could be moved about on the L1000 or driven off the L1000 and used on the shore. When plaintiff began a shift on the L1000 he usually rode to the L1000 on the tugboat, the MV Al Bob, which had its own crew. Plaintiff wore a radio with which he kept in constant contact with the MV Al Bob. There were two common means of locomotion of the L1000 during a work shift. Usually the MV Al Bob moved the L1000 with no physical assistance from plaintiff, although plaintiff signalled the tug when plaintiff needed the L1000 moved and told the pilot of the MV Al Bob where to move it. According to defendant's witnesses this method of locomotion was used 90% to 95% of the time. On the other occasions, when the MV Al Bob was not available, plaintiff controlled the move by dropping the dragline bucket to the riverbed in a direction determined by whether upstream or downstream movement was desired. According to one of defendant's superintendents this method was generally used for movements of no more than 150 feet. Regardless of which method of travel was used, the winchman raised the spuds according to plaintiff's signals, consisting of numbered horn blasts, and when the L1000 reached the desired position plaintiff signalled the winchman by horn blasts to drop the necessary spuds. According to plaintiff, if the dragline was dragging (cleaning) the bank, the L1000 was moved as often as every 15 minutes and all of the movement, up to "a couple thousand" feet per shift, was accomplished without the aid of the tug. There was also testimony that on occasion dragline operators moved empty rock barges using the dragline bucket.

Plaintiff testified at trial that on July 11, 1983, he was climbing to the dragline's cab to begin his shift when his left foot slipped on the dragline track; he lost his grip on a rope handhold, fell to the deck, and was injured. Apparently the rope was tied to the cab of the dragline by agents or servants of defendants. The manufacturer equipped the cab of the dragline, a Bucyrus-Erie 88B, with a handrail for mounting. Plaintiff's expert witness, Professor Donald Creighton, testified that in his opinion the rope handhold was dangerous because it was made of rope and was not rigid. Professor Creighton, a mechanical engineer, testified he had never seen a crane of this type, never tried mounting the crane using this particular handhold, did not talk to anyone who used it to find out if they thought it was safe, and had never before testified as an expert on the subject of safe access to cranes. Plaintiff testified the rope handle made mounting the dragline easier and he used this method to mount the dragline many times in

the past without mishap. Three of defendant's supervisory personnel and seven union-member employees testified at trial on defendant's behalf, as did one expert witness, a marine surveyor and engineer. One supervisor testified the rope handhold was installed in the late 1970s and was still in use, and no accidents had been attributed to it. The other two supervisors testified the handhold was in use 10 years without problem. Each of the union-member employees testified he used the handhold many times and felt it was safe. Defendant's expert testified that in his opinion based on the trial testimony and his observations made while climbing up and down from the cab of the dragline the handhold was safe and complied with OSHA (the Occupational Safety and Health Act of 1970 (29 U.S.C sec. 651 *et seq.* (1983))) regulations. Many of the witnesses described or demonstrated the process of using the rope handle to gain access to the cab, and photographs of the handle and its setting were in evidence at trial.

Evidence at trial indicated plaintiff aggravated a prior injury to his back in the fall. After the fall he underwent surgery to fuse two vertebrae in his lower back. The surgery was only partly successful. An orthopedic surgeon testifying in defendant's behalf stated that in his opinion a second surgery had about an 80% chance of success. Another expert medical witness deposed that in his opinion the chance of success was as much as 95% in light of recently developed techniques. This expert was the same surgeon who performed the original surgery. A treating physician deposed was sure plaintiff would be "permanently status quo, pain, cane and unable to work." Plaintiff testified Dr. Vilray Blair at Barnes Hospital told him the prognosis was not good for a second surgery where the first was unsuccessful and that plaintiff might come out worse than he went in. Plaintiff testified he understood there were no guarantees and he did not want to undergo a second surgery under these circumstances.

Defendant argues the trial court erred in concluding plaintiff was a "seaman" (46 U.S.C. sec. 688(a) (1983)) entitled to sue his employer under the Jones Act for negligence. Defendant concedes plaintiff helped move the L1000 but characterizes his help as occasional and comprising a minuscule portion of plaintiff's responsibilities. *Dungey v. United States Steel Corp.* (1986), 148 Ill. App. 3d 484, 499 N.E.2d 545, the last word by this court on the issue of seaman status, demonstrates the two central problems with applying the Jones Act to the facts of any particular case.

■ The first problem is stating a test of seaman's status in the absence of any substantial guidance from the Jones Act or from the United States Supreme Court. In *Dungey v. United States Steel Corp.*

this court followed the test set forth by the Seventh Circuit of the Federal Court of Appeals, reasoning that to do otherwise would result in a test being applied to a case filed in an Illinois circuit court which was different from the test applied if the case were filed in an Illinois Federal district court. That test, which we adhere to in the case at bar, is as follows: There is an evidentiary basis for submitting to the trier of fact the question of the injured party's status as a seaman if:

"(1) the person injured had a more or less permanent connection with a vessel in navigation, and (2) the person injured made a significant contribution to the maintenance, operation, or welfare of the transportation function of the vessel." *Johnson v. John F. Beasley Construction Co.* (7th Cir. 1984), 742 F.2d 1054, 1062-63, *cert. denied* (1985), 469 U.S. 1211, 84 L. Ed. 2d 328, 105 S. Ct. 1180; *Dungey v. United States Steel Corp.* (1986), 148 Ill. App. 3d 484, 493, 499 N.E.2d 545, 552-53.

■ The second problem in determining seaman status, that of applying the test, is the more vexing of the two, as demonstrated by *Dungey v. United States Steel Corp.*, in which this court was unanimous as to the test to be applied but disagreed as to its application. A majority of this court concluded Dungey was not a seaman as a matter of law because Dungey's only duties were the oiling of a crane situated on a barge and repair of the boom of the crane; Dungey "performed no work in connection with the transportation function of the barge." (148 Ill. App. 3d 484, 495, 499 N.E.2d 545, 553.) In contrast, here plaintiff physically assisted with numerous albeit brief physical movements of the L1000 and was responsible for directing the crew of the L1000 and the pilot of the tug when the L1000 was moved even when the movement was accomplished without plaintiff's physical assistance.

In *Johnson v. John F. Beasley Construction Co.*, the Seventh Circuit concluded Johnson, an ironworker, was not a seaman. Johnson was employed by a structural steel contractor to work in the removal and replacement of a span of a railroad bridge over the Illinois River. Plaintiff, a foreman in charge of the crew performing the work, was transported daily by tug to a barge used as a work platform in the river channel. The barge supported a large crane used in the removal and erection of structural steel. The barge had no motive power, but was nonetheless a vessel in navigation; a tug moved it downstream, where construction material was loaded onto it from trucks on shore with the use of a crane. On such occasions Johnson assisted in the loading and handled lines. *Johnson v. John F. Beasley Construction Co.* is distinguishable from our case, in which plaintiff physically as-

sisted in moving the L1000 on a regular basis and supervised the moving on a continual basis. Other distinguishable cases urged by defendant for factual comparison include *McSweeney v. M. J. Rudolph Corp.* (E.D.N.Y. 1983), 575 F. Supp. 746 (the plaintiff's deceased was never on the barge when it was moving); *Lynn v. Heyl & Patterson, Inc.* (W.D. Pa. 1980), 483 F. Supp. 1247 (the plaintiff, an ironworker, was aboard the barge on various occasions but did not operate the crane and had no fixed or usual duties with respect to the barge); *Bellomy v. Union Concrete Pipe Co.* (S.D. W. Va. 1969), 297 F. Supp. 261 (the crane the plaintiff operated was on the dock); *Buna v. Pacific Far East Line, Inc.* (N.D. Cal. 1977), 441 F. Supp. 1360 (held, not a Jones Act "vessel"); *McNeill v. J. E. Brenneman Co.* (E.D. Pa. 1983), 1986 A.M.C. 2241 (same); and *Powers v. Bethlehem Steel Corp.* (1st Cir. 1973), 477 F.2d 643 (the plaintiff performed maintenance on a pier from a raft tied to the pier). We observe little significance in defendant's argument that the dragline could be removed from the vessel and used on land.

In light of the above discussion, we cannot conclude plaintiff's duties were not those of a Jones Act "seaman" as a matter of law. In our opinion the issue was at most a question of fact for the judge to determine as the finder of fact.

■ Defendant argues the L1000 was not a "vessel in navigation," citing cases in which a barge used primarily as a construction platform was held not to be such a vessel. The issue was one of fact for the trial judge to determine unless it could be decided as a matter of law. (See *Dungey v. United States Steel Corp.* (1986), 148 Ill. App. 3d 484, 489, 499 N.E.2d 545, 549.) The cases defendant cites concern "platforms" unlike the L1000 in configuration or use: *Bernard v. Binnings Construction Co.* (5th Cir. 1984), 741 F.2d 824 (the parties stipulated the work punt was used solely as "a small work platform"); *Smith v. Massman Construction Co.* (5th Cir. 1979), 607 F.2d 87 (the plaintiff, a welder, worked upon a floating caisson tethered to the bank while being prepared for incorporation into a bridge column); *Leonard v. Exxon Corp.* (5th Cir. 1978), 581 F.2d 522 (the platform consisting of four barges was moored to the bank); *Cook v. Belden Concrete Products, Inc.* (5th Cir. 1973), 472 F.2d 999 (the moored platform, a barge, moved only along plaintiff's dock); and *Buna v. Pacific Far East Line, Inc.* (N.D. Cal. 1977), 441 F. Supp. 1360 (the plaintiff admitted that "at the present time, the paint float has the function of a floating stage used by defendant's servants who work within the harbor."). The L1000 was not tethered or moored. As equipped it was capable of locomotion and did move itself, not within some harbor or

still water but upstream and downstream upon the Mississippi River. In our opinion it could not be said as a matter of law that the L1000 was a mere work platform; the issue was correctly resolved as one of fact. See *Summerlin v. Massman Construction Co.* (4th Cir. 1952), 199 F.2d 715 (reversing trial court's holding that a fireman on a barge on which a crane was erected was not a seaman upon a vessel engaged in navigation).

■ Defendant argues plaintiff was injured during his second week aboard the L1000 and thus as a matter of law did not have a "more or less permanent connection" with the L1000. (*Johnson v. John F. Beasley Construction Co.* (7th Cir. 1984), 742 F.2d 1054, 1063, *cert. denied* (1985), 469 U.S. 1211, 84 L. Ed. 2d 328, 105 S. Ct. 1180; *Dungey v. United States Steel Corp.* (1986), 148 Ill. App. 3d 484, 493-96, 499 N.E.2d 545, 552-53.) The issue was one of fact for the trial judge to determine unless it could be decided as a matter of law. (See *Dungey v. United States Steel Corp.* (1986), 148 Ill. App. 3d 484, 489, 499 N.E.2d 545, 549.) On this evidence the trial court was entitled to conclude plaintiff was injured during the second week of a more or less permanent assignment aboard the L1000, as there was no affirmative evidence that plaintiff's assignment was of a lesser duration. (See *Longmire v. Sea Drilling Corp.* (5th Cir. 1980), 610 F.2d 1342, 1347 n.6 ("Our holding on this issue should not be taken to mean 'once a platform worker, always a platform worker,' nor that one who has been a platform worker cannot become a seaman until he has been working as a seaman for some time. *** What is to be avoided is engrafting upon the statutory classification of a 'seaman' a judicial gloss so protean, elusive, or arbitrary as to permit a worker to walk into and out of coverage in the course of his regular duties").) We conclude the issue was properly resolved as one of fact.

■ Defendant argues the trial court erred in finding defendant negligent. This court will not disturb a trial court's finding and substitute its own opinion unless the finding is against the manifest weight of the evidence. Especially where the evidence is contradictory, the trial court is in a superior position to weigh the evidence and determine the preponderance thereof. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624, 626.) The finding of negligence was supported by photographic exhibits of the accident scene, including the rope handhold, by numerous descriptions and demonstrations of the process of entering the dragline cab and by expert testimony that the handhold was unsafe. Plaintiff's contention, accepted by the trial court, was that use of the rope handhold exerted a horizontal force on the user's body so that a loss of grip naturally re-

sulted in the user landing on his back instead of his feet, and that this was what happened to plaintiff. There was expert and lay testimony that the handhold was safe, but the credibility of the witnesses and the weight of the testimony are for the trier of fact to determine.

Defendant argues the award of damages was excessive. The trial court found the 38-year-old plaintiff permanently unemployable as an operating engineer, that plaintiff's refusal to have additional surgery was not unreasonable in light of its poor prognosis, and that plaintiff's condition was extremely painful and seriously inhibited his recreational, social and family activities. The parties stipulated plaintiff's medical expenses as of trial were $24,593.91. An economist testified plaintiff lost past wages of $78,424 and would lose future wages with a present value of as much as $684,936 based on certain stated assumptions. The court accepted these wage loss figures, assessed plaintiff's damages to be $2,363,862 (*i.e.*, three times the sum of medical expenses and lost past and future wages) and reduced that amount by 30% to reflect plaintiff's contributory negligence to that extent.

A reviewing court will not disturb a trial court's findings as to damages unless against the manifest weight of the evidence. (*Pathman Construction Co. v. Hi-Way Electric Co.* (1978), 65 Ill. App. 3d 480, 490, 382 N.E.2d 453, 461.) Defendant argues the trial court should have reduced plaintiff's damages in light of evidence that plaintiff might be able to work again as a heavy equipment operator after surgery. In light of the evidence that another surgery might worsen plaintiff's condition, we do not believe the trial court was obligated to accept defendant's contention that plaintiff was in effect obligated to opt for the second surgery. We are mindful as was the trial court of defense counsel's thorough cross-examination of plaintiff's expert witness on the subject of future lost wages. However, the weight of that testimony and the credibility of that witness were for the trier of fact to determine. See *People v. Bilyew* (1978), 73 Ill. 2d 294, 302, 383 N.E.2d 212, 215.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

HARRISON, J., concurs.

PRESIDING JUSTICE KARNS, dissenting:
I find it difficult to equate the duties of plaintiff, a member of the

Operating Engineers Union, with those of a ship's captain. The work barge had no motive power and obviously could only be moved downstream by flotation when the mooring spuds were removed.

Assuming the barge to be a vessel in navigation, a matter not free from doubt, I do not consider plaintiff to be a seaman. We recently reviewed the cases dealing with seaman status in *Dungey v. United States Steel Corp.* (1986), 148 Ill. App. 3d 484, 499 N.E.2d 545. There, the plaintiff, a member of the Operating Engineers Union, worked as an oiler on a construction crane affixed to a work barge in the Mississippi River. The barge had no motive power but was occasionally moved a few feet downstream by manipulating mooring spuds. We adopted the test of *Johnson v. John F. Beasley Construction Co.* (7th Cir. 1984), 742 F.2d 1054. A seaman is one who is a master or member of the crew of a vessel in navigation whose duties make a *significant* contribution to the transportation function of the vessel.

I would conclude that our disposition in *Dungey* would dispose of plaintiff's status in the instant case.