FRANCIS W. MEADE *et al.*, Plaintiffs and Counterdefendants-Appellants, v. GERRY KUBINSKI *et al.*, Defendants and Counterplaintiffs-Appellees (Heritage Material, Inc., Intervenor-Appellee).

Third District   No. 3—94—0348

Opinion filed February 16, 1996.

Edward Petka (argued), of Plainfield, for appellants.

Randal J. Miller (argued), of Dunn, Martin & Miller, Ltd., of Joliet, for appellees.

PRESIDING JUSTICE HOLDRIDGE delivered the opinion of the court:

This matter involves a dispute over a written lease between the plaintiffs/counterdefendants, Francis and Marjorie Meade (the Meades), as lessors and the defendants/counterplaintiffs, Gerry and Peggy Kubinski (the Kubinskis), as lessees of a seven-acre tract of farmland for use in the Kubinskis' gravel crushing operation.

In their complaint, the Meades alleged that the Kubinskis breached the lease in failing to pay royalties on certain materials processed on the leased property and in failing to return the property in as good a condition as it was before the Kubinskis took possession. The Kubinskis filed a countercomplaint alleging that the Meades had improperly terminated the lease. Heritage Materials, Inc. (Heritage Materials), a corporation owned by the Kubinskis, intervened as an interested party in the countercomplaint.

Following a bench trial, the trial court found that the Kubinskis had breached the lease and assessed damages of $43,980 for unpaid

royalties and $30,000 for the failure to restore the property to the condition it was in prior to taking possession. The trial court also entered judgment against the Kubinskis on their countercomplaint. The Meades appeal the measure of damages awarded by the trial court on each count; the Kubinskis and Heritage Materials appeal the denial of their counterclaim. We affirm in part, reverse in part, and remand this cause to the trial court.

## FACTS

The Meades owned a 160-acre farm in Channahon Township in Will County, which they had farmed since 1954. The Meade farm consisted overall of highly productive Brenton, Warsaw, and Lorenzo silt loam soil of a thickness of two to three feet. For more than 30 years the farm had produced crops of corn, wheat, soybeans, and tomatoes. In the 10 years immediately prior to the Kubinski lease, however, the land had been used only to grow cattle feed and to pasture cattle.

The Kubinskis owned a 160-acre tract immediately south of the Meade farm, which they purchased with the intention of developing as a residential lake community. Prior to purchasing their property, the Kubinskis initiated discussions about leasing a small tract of property from the Meades where they would process and sell the gravel removed in digging the lake on their own property.

Several meetings between the parties took place over approximately a year. At one meeting, the parties apparently reached a verbal agreement for the Kubinskis to remove material from their property, transport the material to the seven-acre tract leased from the Meades, and process the material into gravel. It was also agreed at this meeting that the Meades would receive 50 cents for each ton of gravel processed and sold from the leasehold. Other terms of the agreement were still unresolved. Subsequent to this oral agreement, the Kubinskis submitted a written lease agreement to the Meades. The lease contained a "yield-up" clause calling for the property to be returned "in as good condition as when the same were entered upon *** loss of fire or inevitable accident and ordinary wear excepted." The Meades submitted a revised written lease, and negotiations continued.

After additional discussions and consultations with their attorneys, a written lease, drafted by the Meades' attorney, was executed on November 6, 1989. The lease provided that the Kubinskis would use the seven-acre plot for a gravel crushing operation in return for which they would pay the 50-cent-per-ton royalty for all gravel processed and sold on the Meade leasehold. In addition, the

lease contained a yield-up clause in substantially similar form to the one submitted originally by the Kubinskis.

Shortly thereafter, the Kubinskis incorporated Heritage Materials and began the gravel crushing operation. It soon became apparent to the Kubinskis that the gravel they were crushing on the Meade property was not of sufficient quality to be commercially viable. At some point in 1991, the Kubinskis changed their method of processing material into gravel by starting a washing operation, a process by which dirty stone is cleaned by pumping water under pressure through the material. The Kubinskis claim that they informed the Meades of this change in operations. The Meades, however, deny being so informed.

The washing operation created a residue by-product known as "slimes," a talcum-powder like substance with very poor draining properties. The Kubinskis initially stored the slimes in silt ponds on the leased property; however, due to the large amounts of slimes the silt ponds quickly became filled, and slimes then began to run off onto the Meades' adjacent pastureland, causing some of their cattle to become ill. Additional silt canals were then built in an attempt to handle the runoff. The presence of slimes, which had a gelatinous consistency, prevented the proper drainage of the soil for agricultural purposes.

In order to accomplish the washing operation, the Kubinskis stripped the topsoil from the subject property and placed it in "windrows" on or near the property. The Meades' expert testified that this native topsoil was subsequently removed from the site and replaced with a course clay material with a mixture of rock and gravel. This topsoil was unavailable when the time came for the Kubinskis to return the property.

In July 1991, the Meades filed for a temporary injunction to stop the washing operation, contending that it had been commenced without their permission and was a breach of the lease. They also filed for an accounting, for forcible entry and detainer, and an action for trespass. The Kubinskis counterclaimed for breach of lease, alleging that the Meades' refusal to permit washing operations constituted a breach, and further alleging substantial loss of profits as a result of the breach. Even after the lawsuit was filed, however, the Kubinskis continued to process and wash gravel on the subject property for several months.

Eventually, an agreed order was entered halting the gravel washing operation. The Kubinskis admitted that they owed the Meades $43,980 for materials processed on the subject property between the time the complaint was filed and the time the agreed order was

entered. The Meades contended, however, that the Kubinskis removed an additional 143,572 tons of material for which the Meades received no compensation. The Kubinskis maintained that the 143,572 tons were unprocessed leftover waste product that could not be sold and therefore no royalty was owed when that material was removed from the leasehold. The Kubinskis acknowledged that the material could have been processed and sold had the Meades not stopped the processing operations, and the Meades would have been due royalties. Instead, the Kubinskis were allowed to truck the material off the premises for processing elsewhere. The Meades contended that the questioned materials were processed on the leasehold and that they were therefore entitled to compensation.

## ANALYSIS

## I. THE MEADES' CLAIM FOR UNPAID ROYALTIES

The Meades first maintain on appeal that the trial court erred in determining the amount of damages owed to them in the form of unpaid royalties. They contend that they were entitled to royalty payments for the 143,572 tons of material that were removed from the leasehold at the time the property was surrendered by the Kubinskis. They also contend that they are owed royalties on several thousand tons of gravel allegedly removed by the Kubinskis when a well and silt canals were dug on the subject property. The Meades also maintain that approximately 20,000 tons of topsoil were removed from the subject property by the Kubinskis for which the Meades received no compensation.

■ The question of the amount of damages due under a contract is generally a question of fact for the trial court, and it is well settled that a reviewing court may not disturb a trial court's finding as to damages unless it is against the manifest weight of the evidence. (*Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266; *Dale v. Luhr Brothers, Inc.* (1987), 158 Ill. App. 3d 402.) To uphold a contention that a damage award is contrary to the manifest weight of the evidence, it must be found that the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law. *Vee See Construction Co. v. Luckett* (1981), 102 Ill. App. 3d 444, 447.

The written lease stated that the Kubinskis would pay 50 cents for every ton of "processed gravel sold from the premises." The question to be answered by the trier of fact was whether the disputed material was "processed gravel sold from the premises." The trial court determined, based upon the evidence, that the disputed material was not processed gravel but was instead unprocessed waste material. This is a pure question of fact and thus the trial court's determina-

tion will be overturned on review only if it is clearly erroneous, *i.e.*, unsupported by the evidence.

■ Our review of the record reveals that the trial court's decision was supported by the evidence, and we therefore cannot say that the trial court ignored the evidence and reached a clearly erroneous result. While the trial court heard evidence supporting the Meades' contention that the 143,572 tons of material were processed gravel sold from the premises, it also heard evidence supporting the Kubinskis' contention that the material was unmarketable waste product that required processing in order to be of any commercial value. In reaching the conclusion that the Meades' measure of damages did not include royalties for these materials, the trial court was required to weigh this conflicting testimony and assess the credibility of witnesses. It is long established that a court of review will not disturb a judgment where it is based upon an assessment of the credibility of the witnesses. (*Economy Fire & Casualty Co. v. Warren* (1979), 71 Ill. App. 3d 625, 627.) Thus, "[t]he credibility of the witnesses and the weight to be accorded their testimony is a matter solely within the province of the trial court as trier of fact." *Ross v. Steiner* (1978), 66 Ill. App. 3d 567, 574.

We also note that the Meades have not advanced any argument that the trial court's measure of damages was erroneous as a matter of law. Our own review of the record likewise reveals that the trial court's determination of the amount of damages was not erroneous as a matter of law. We therefore find that the trial court's finding as to the amount of damages for unpaid royalties was not contrary to the manifest weight of the evidence.

## II. THE MEADES' CLAIM FOR BREACH OF COVENANT TO RETURN THE LEASEHOLD IN AS GOOD A CONDITION AS WHEN THE PROPERTY WAS ORIGINALLY LEASED

The Meades' final contention on appeal is that the trial court erred in setting $30,000 as the amount of recovery for damages caused to the property by the Kubinskis' washing operation. The Meades contend that the trial court erred in finding the measure of damages was limited to the cost of returning the property to a condition suitable for its previous use, rather than the cost of returning the property to the exact condition it was in prior to leasing of the property. The Meades maintain that the proper measure of damages for returning the land to its prior condition was at least $132,480, which included the costs of replacing the soil removed by the Kubinskis with the same quality of soil necessary to produce agricultural products previously produced on the land. The Kubinskis maintain

that the trial court properly measured damages as the cost of returning the land to a condition suitable for use as pastureland.

The Meades argue that the yield-up clause of the written lease, which required the Kubinskis to return the property "in as good condition as when the same were entered upon by the lessee, loss by fire or inevitable accident and ordinary wear excepted," unambiguously shows that it was the intent of the parties that the Kubinskis would return the leased property in the exact condition it was in prior to the lease, including the identical soil type and condition. The Kubinskis contend, however, that the yield-up clause is ambiguous and that the clause, having been drafted by the Meades, should be construed against the Meades so as to require the Kubinskis only to return the property in a condition sufficient for the Meades to return the land to its immediate prior use, *i.e.*, pastureland. The trial court appears to have agreed with the Kubinskis when it determined that their obligation under the lease was merely to return the property in a condition fit for the immediate prior use by the lessor.

We do not believe, however, that the yield-up clause is useful in determining the Meades' proper measure of damages for the Kubinskis' failure to return the leased property in as good a condition as when the property was leased. The yield-up clause indicates the general intent of the parties regarding the lessee's obligation to return the leased property in a particular condition at the termination of the lease, *i.e.*, "in as good condition as when the same were entered upon *** loss of fire or inevitable accident and ordinary wear excepted." The clause is silent or, at best, ambiguous as to whether the phrase "in as good condition as when the same were entered upon" included a duty on the part of the Kubinskis to return the land with the same soil fertility. Neither is it useful to construe the clause strictly against the drafters, as the Kubinskis suggest. It appears from the record that both sides participated more or less equally in the final drafting of the written agreement.

The issue before us in this matter is the proper measure of damages for a lessee's breach of a covenant to return leased real property upon termination of the lease in the same condition as when the property was leased, absent fire or normal wear and tear. In the matter *sub judice*, the Kubinskis do not dispute that the property was not returned in as good a condition as when it was originally leased, nor do they maintain that the condition of the property at the termination of the lease was the result of loss by fire or normal wear and tear. They acknowledge their breach of the lease but maintain that the measure of damages for which they were liable should be limited to the cost of returning the property to a condition suitable

for the same use to which the lessor had put the property prior to the commencement of the lease.

It is well settled that a reviewing court will not disturb a trial court's finding as to damages unless its measure of damages was erroneous as a matter of law or the trial court ignored the evidence. (*Bockman Printing & Services, Inc. v. Baldwin-Gregg, Inc.* (1991), 213 Ill. App. 3d 516, 523.) In the matter *sub judice*, we find that the trial court's measure of damages, *i.e.*, that the Kubinskis need only return the property to a condition suitable for use as pastureland, was erroneous as a matter of law.

■ An instructive summary and analysis of Illinois cases regarding the measure of damages for injury to real property is presented in *Williams-Bowman Rubber Co. v. Industrial Maintenance, Welding & Machining Co.* (N.D. Ill. 1987), 677 F. Supp. 539. The court in *Williams-Bowman*, after noting inconsistent holdings on this issue, concluded that in Illinois the proper measure of damages for injury to real property, whether the action for damages sounds in tort or in contract, depends upon the nature of the injury involved. (*Williams-Bowman*, 677 F. Supp. at 545.) "If real property is partially injured, and the injury may be repaired *in a practicable manner*, then the proper measure of damages is the cost of restoring the property to its condition prior to the injury. If, however, the real property is totally destroyed or *damaged in a manner which renders repair impracticable*, then the diminution in value rule applies." (Emphasis added.) (*Williams-Bowman*, 677 F. Supp. at 545.) The diminution in value rule measures damages as the difference between the fair market value of the real property before and after the injury to the premises. *First National Bank v. Amco Engineering Co.* (1975), 32 Ill. App. 3d 451, 454.

The *Williams-Bowman* court relied upon *Arras v. Columbia Quarry Co.* (1977), 52 Ill. App. 3d 560, wherein the court stated:

"[I]n cases of injury to real estate or to that which has no value separate and apart from the real estate, the proper measure of damages is as follows: (1) if the injury is permanent, the measure of damages is the market value of the real estate before the injury, less the market value after the injury; (2) if the injury to real estate is not permanent, then the measure of damages is the cost of restoration." *Arras*, 52 Ill. App. 3d at 564-65.

The *Williams-Bowman* court's statement of the general rule was cited with approval by the appellate court in *Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.* (1994), 259 Ill. App. 3d 836, 860 (landlord's action for tenants' breach of covenant to make repairs), and *Matich v. Gerdes* (1990), 193 Ill. App. 3d 859, 865.

Under Illinois law, in order to determine the proper measure of damages in a case of injury to real property, a trier of fact must first determine whether the injury is permanent, *i.e.*, the property is damaged in a manner which renders repair impracticable, or temporary, *i.e.*, the injury may be repaired in a practicable manner. The critical inquiry that must be made in order to properly measure a lessor's damages is whether the repairs necessary to return the real property to its proper condition are practicable. This inquiry must in turn lead to a determination of what constitutes impracticability of repair.

The *Williams-Bowman* court commented that an injury to real property would be impracticable to repair if it "would put the defendant to disproportionate expense or effort to restore it to its condition prior to the injury." (*Williams-Bowman*, 677 F. Supp. at 545.) The court further noted that this concept of impracticability of repair would explain why a court would not compel a defendant to rebuild a barn with a market value of $50 at a replacement cost of $500. (See *Johnson v. Pagel Clikeman Co.* (1951), 343 Ill. App. 346.) A basic tenant of contract law is that an aggrieved party is entitled to recover his actual damages without penalizing the liable party. (See Restatement (Second) of Contracts § 347 (1981).) Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages. The purpose of this rule is "to prevent windfall recoveries." See *Ceres Terminals*, 259 Ill. App. 3d at 861.

Our research reveals that other jurisdictions, concerned with awarding a windfall or encouraging economic waste, have limited the measure of a landlord's recovery for a tenant's breach of a covenant to repair to the lesser of the cost of repairs or the diminution in market value of the property. See *Lipton Realty Co. v. St. Louis Housing Authority* (Mo. App. 1986), 705 S.W.2d 565, 569 (purpose of damages in a contract action is to restore plaintiff to the position he would have been in absent breach, not place him in a better position; damages based upon diminution accomplish this end); *Fayette R. Plumb, Inc. v. Cooper Industries, Inc.* (E.D. Pa. 1984), 587 F. Supp. 64, 65 (cost of repairs is merely a convenient way to quantify damages, but should not be applied when it is unrelated to the actual damages suffered by the lessor); *Missouri Baptist Hospital v. United States* (Ct. Cl. 1977), 555 F.2d 290, 296 (recovery based upon cost of repairs is subject to an absolute ceiling of diminution in value); *Leishman v. Kamas Balley Lumber Co.* (1967), 19 Utah 2d 150, 152, 427 P.2d 747, 749 (if the cost of restoration for real property is less than the diminution of value, courts should award the cost of restoration); *General Outdoor*

*Advertising Co. v. La Salle Realty Corp.* (1966), 141 Ind. App. 247, 267, 218 N.E.2d 141, 151 (permanent injury to land occurs where the cost of restoration exceeds the market value); *Crystal Concrete Corp. v. Town of Braintree* (1941), 309 Mass. 463, 470, 35 N.E.2d 672, 675 (in an action for breach of covenant to return real property in proper condition after excavation, court held "expense for repairs would not be a reasonable, practical or economical method of dealing with the property"); *Pennsylvania Cement Co. v. Bradley Contracting Co.* (2d Cir. 1926), 11 F.2d 687 (Hand, J.) (if cost of repair rule will give lessors a greater benefit than could be gained by full performance, a different measure of damages must be applied to avoid injustice).

■ The record contains no evidence of the market value of the leased property before and after the injury inflicted upon it by the Kubinskis' washing operation. We recognize that normally where the plaintiff has proven an entitlement to damages, but has failed to provide evidence of the proper measure of damages, he or she will normally be entitled only to nominal damages. (*Rosos Litho Supply Corp. v. Hansen* (1984), 123 Ill. App. 3d 290, 300.) We believe, however, that remand to the trial court to take evidence concerning the diminution in market value of the leased property in order to correctly measure damages is more appropriate in these circumstances.

We also note that in arriving at the proper measure of damages, the cost of restoration must be the cost of returning the land to the condition it was in prior to the injury. (*Williams-Bowman*, 677 F. Supp. at 545.) In the matter *sub judice*, this would be the cost of returning the land to its previous level of agricultural fertility. There was no dispute at trial that the land was returned in a significantly less fertile condition than when it was originally leased, as all of the Kubinskis' experts conceded that their opinions were based upon returning the land in significantly less fertile condition than when the property was originally leased.

We hold that in order to return the land in the same condition as prior to the injury, *i.e.*, the stripping of topsoil and depositing of slimes, it would be necessary to return the land to its former fertility. Therefore, upon remand to the trial court, the evidence originally presented by the Kubinskis concerning the cost of restoring the property for use as pastureland cannot be relevant to determining the cost of returning the property in "as good a condition" as when the land was originally leased. In order to determine the proper measure of damages, the trial court should compare the cost of restoring the land to its previous level of fertility with the diminution in market value at its highest and best use, and award the lesser amount.

## III. THE KUBINSKIS' CROSS-APPEAL

■ The Kubinskis and Heritage Materials filed a cross-appeal on the trial court's denial of their counterclaim against the Meades. The trial court ruled that the Meades had not breached the contract when they prevented the Kubinskis from continuing their gravel washing operation on the leased property. We affirm.

Whether a party has breached a contract is a question of fact, and a finding of a breach or lack of a breach will not be disturbed unless it is contrary to the manifest weight of the evidence. (*Neibert v. Schwenn Agri-Production Corp.* (1991), 219 Ill. App. 3d 188, 190.) The record indicates that the trial court found the Kubinskis were already in breach of the lease by failing to pay royalties in January 1992 when the Meades shut off power to the property and thereby prevented the Kubinskis from resuming washing operations in April 1992. The trial court's ruling on the counterclaim is therefore not against the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, we affirm the trial court as to the payment of royalties and as to the denial of the counterclaim. We reverse and remand for a proper determination of the damages owed by the Kubinskis for breach of the covenant to return the property in as good a condition as when the property was originally leased.

Affirmed in part; reversed and remanded in part.

BRESLIN, P.J., and LYTTON, J., concur.