AMALGAMATED BANK OF CHICAGO, Plaintiff-Appellee, v. KALMUS AND
ASSOCIATES, INC., Defendant-Appellant.

First District (2nd Division)    No. 1—99—3888

Opinion filed December 26, 2000.—Rehearing denied February 2, 2001.

C. Joseph Yast, of Law Office of C. Joseph Yast, of Northfield, for appellant.

Kevin J. Moore, of Rothschild, Barry & Myers, of Chicago, for appellees.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

Defendant Kalmus & Associates, Inc., appeals a judgment against it for breach of contract and damages of $541,291.74. At issue is the meaning of an agreement defendant signed and the obligation undertaken to eliminate the contamination caused at the site defendant leased from plaintiff Amalgamated Bank of Chicago. A second issue is the amount of damages awarded by the trial court. We affirm.

Plaintiff sued defendant on January 13, 1998. Count I alleged breach of contract for failure to comply with a cleanup agreement and lease requirements that the property be returned in the same condition as received. Count II alleged a common law wrongful possession claim. Count III alleged a holdover claim. Count IV alleged a holdover after notice claim. Count V sought prejudgment interest.

The court entered judgment for plaintiff on count I after a bench trial. The court entered judgment for defendant on all remaining counts. Damages were assessed at $541,291.74. Plaintiff did not cross-appeal the judgment for plaintiff on counts II through V.

The following evidence was received at trial.

Plaintiff is the trustee of a land trust that holds title to a commercial building in Broadview, Illinois. Defendant is an electronic circuit board manufacturer. Defendant leased the Broadview building from March 1989 through April 1994 under a triple net lease. A triple net lease requires the tenant to pay insurance, taxes and utilities in addition to rent. The parties extended the lease by agreement until April 1996.

Defendant found a 9- to 12-inch hole in the concrete floor while moving out of the building in March 1996. The hole was caused by copper chloride that had leaked in solution from an etching machine. The solution ate through the floor and spread to the "gravel stone base coarse" under the floor. The soil and gravel stone were contaminated with copper, and the groundwater was contaminated with chlorides.

The parties entered into an agreement on June 24, 1996, that set out the steps defendant was to take to remove the contamination. This agreement, the wording of which is at the heart of defendant's appeal, read in part:

"1. Kalmus shall take those steps necessary at the Premises to enable it to obtain from the Illinois Environmental Protection

Agency a 'no further remediation' letter which letter shall indicate in essence that, based on the industrial/commercial use of the property, the copper and chloride residual does not require further remediation under the Illinois Environmental Protection Act.

2. Upon receipt of such 'no further remediation' letter, Bank fully and unconditionally releases and forever discharges Kalmus *** from any and all claims, demands, and causes of action of any nature which Bank has or claims to have or hereafter accrue against Releases arising out of or relating to i) Kalmus' use of cupric chloride on the Premises; or ii) the existence of copper or chloride or any combination thereof on or beneath the Premises.

***

4. It is expressly understood that Bank is not releasing its claim that it is entitled to holdover rent until such 'no further remediation' letter is received. However, by executing this Agreement, Kalmus does not admit that it is liable to Bank for such holdover rent. Said claim shall be addressed by the parties separate and apart from this Agreement."

Paul Gearen, president of a real estate firm that arranges the lease and purchase of commercial real estate, testified for plaintiff. Gearen testified that a "no further remediation" (NFR) letter from the Illinois Environmental Protection Agency (the agency) was required because environmental issues are important in commercial real estate transactions. As owner of the property, plaintiff, not defendant, was required by law to sign an agency report of contamination asking for an NFR letter.

An agency report of contamination describes the steps to be taken to clean up contaminated sites. An NFR letter is *prima facie* evidence that the steps taken complied with the agency regulations and that no further steps are needed. The NFR letter is recorded and becomes part of the chain of title of the property.

The agency has developed guidelines for cleaning contaminated sites. These guidelines are known as the Tiered Approach to Corrective Action Objectives (TACO). TACO guidelines direct that an environmental risk analysis be conducted under a three-tier approach.

Under tier 1, a landowner consults an agency table to see what concentration of a contaminant is allowed, given the use of the property. The owner then removes enough of the contaminant to comply with allowable levels. Defendant's environmental engineer, James Huff, testified that tier 1 certification may still be obtained even if levels of concentration are higher than those allowed by the tables, so long as an "engineered barrier" is put in place to "limit exposure to, or control migration of, the contamination." A concrete floor is one example of an engineered barrier. Tier 1 is the easiest certification to receive from the agency.

Wayne Smith, a Pioneer Environmental, Inc., senior project manager, testified for plaintiff. Smith said that Pioneer was an environmental consulting firm that ultimately performed the cleanup that enabled plaintiff to receive a "no further remediation" letter. Smith said that if tier 1 objectives are not met, an additional analysis under tier 2 or 3 or additional remediation is needed.

A tier 2 or tier 3 analysis is required when concentrations of the contaminant left at the site are higher than those listed in the tables. To obtain a "no further remediation" letter under either tier 2 or 3, a more rigorous review of the risk posed by the contaminant must be done. Several issues, including possible migration of the contaminant, are considered. Certification under either tier 2 or 3 is more time consuming. It may result in restrictions on the use of property. There are three types of restrictions: (1) an industrial/commercial restriction; (2) the requirement of an engineered barrier; and (3) a safety plan to alert and address worker exposure hazards. A tier 3 analysis is more complex than tier 2 and subjects the property to more rigorous review by the agency.

Evidence at trial established that the tier 1 table lists two acceptable concentrations for a copper contaminated industrial site. Smith explained that, within the industrial/commercial objective, there are two groups of people who may be exposed to contamination: the industrial/commercial worker and the construction worker. For an industrial/commercial worker, the acceptable concentration is 82,000 milligrams per kilogram. The acceptable concentration for a construction worker is 8,200 milligrams per kilogram (mg/kg). The concentration for construction workers is substantially less than that for an industrial/commercial worker because the construction worker is presumed to engage in invasive work into the soil and may be subject to greater exposure.

James Huff, an environmental engineer, undertook the remediation effort for defendant. Huff testified that he believed it was his task to clean the site to ensure no concentrations of copper higher than 82,000 mg/kg and so meet the objective for an industrial/commercial worker. Huff testified that no part of the contaminated area showed a contamination higher than 82,000 mg/kg. Huff's remediation report prepared for the agency showed that he excavated a 22-foot by 34-foot area of concrete flooring and tested samples of the exposed area. Samples from in and around the exposed area were tested. Where not already exposed, samples were removed by coring through the concrete. A total of 247 square yards of concrete and soil were removed. Tests showed that remaining copper levels were below the 82,000 mg/kg level for industrial/commercial use, but that the 8,200

mg/kg level to safeguard the construction worker was exceeded in half of the final base core samples.

Smith testified that, to meet a tier 1 objective for copper for industrial/commercial use, the NFR applicant must remediate to the most stringent level. This ensures that both the industrial/commercial worker and the construction worker are protected. Smith noted that only the excavated area met the 8,200 mg/kg level. Several core samples from the area just outside the excavation exceeded this level. Smith said that if the property did not meet the lower level, a tier 2 or 3 analysis would be necessary and the NFR letter would contain restrictions.

Huff noted that the test samples showed the copper migrated laterally over the surface, not vertically, so that remediation in his opinion only required removal of surface soil. Huff's conclusions suggested the use of a six-inch concrete floor as an engineered barrier to be placed over the remaining area. Huff also suggested a safety plan under the Occupational Safety Health Administration (OSHA) as a restriction on the property. Huff's report asked for an NFR letter based on these conclusions. Defendant then poured a new concrete floor in August 1996, before plaintiff signed the report or the agency reviewed it. Defendant did not submit Huff's report to plaintiff for signature until September 1996.

Plaintiff objected to Huff's report by letter on September 24, 1996. Plaintiff told defendant that it did not want an engineered barrier or OSHA plan. Plaintiff explained that the only acceptable restriction was one that limited the property to industrial/commercial use. Plaintiff asked defendant to "take whatever further excavation actions necessary to remove" the suggested restrictions from the NFR letter request.

Defendant did not remove more contaminated soil from the building. Instead, defendant revised its report, submitting additional conclusions to support an NFR letter without the original restrictions. Evidence at trial established that the revised report required a tier 2 or tier 3 analysis. Defendant submitted the revised report to plaintiff on January 16, 1997. Gearen testified that he did not immediately sign the report, choosing instead to have it reviewed by Pioneer Environmental, Inc., its own engineering consultant. Gearen said he asked for this review to determine the reasonableness of the revised report. Gearen testified he signed the report "against his better judgment" in August 1997.

The agency responded to the revised report on November 7, 1997, and questioned several of Huff's conclusions. The letter stated that an NFR letter would not issue until the concerns raised by the agency

were addressed. A series of letters between Huff and the agency were exchanged from November 1997 until May 1998. The report was under a tier 3 analysis by this date. The Office of Chemical Safety (OCS), whose approval is required for tier 3 reviews, first denied approval, citing several concerns. The OCS is a division within the agency.

On June 16, 1998, the agency issued a draft NFR letter. The agency stressed that a formal NFR letter depended on an OCS determination that the copper contamination did not pose a threat to human health or the environment. The draft letter also included an OSHA restriction that was not acceptable to plaintiff.

Plaintiff had, in May 1998, notified the agency that it was frustrated by "the indirect and inefficient" way defendant undertook the cleanup and intended to assume the responsibility. Plaintiff then retained Pioneer Environmental, Inc., in November 1998 to perform the cleanup and obtain an NFR letter.

Pioneer followed the most stringent tier 1 objectives for residential, rather than industrial, use. It excavated 1,600 square feet of concrete floor and removed 150 cubic yards of stone and soil at a cost of $66,368.75. The chloride-contaminated groundwater was not removed. Pioneer submitted its report to the agency on March 25, 1999. Huff's revised report was still pending. Pioneer's report sought an approval with no restrictions.

The agency issued an NFR letter to plaintiff based on Pioneer's report on June 16, 1999. The letter approved the site for residential use with no restrictions other than a groundwater restriction not relevant to this appeal.

Evidence at trial established that the market value of the property was between $884,800 and $1,011,200. The property was vacant from the expiration of defendant's lease until the time of trial on July 12, 1999. The fair rental value of the building for these three years was estimated at $308,205. At least one prospective tenant, Display Graphics, showed interest in leasing the property. No lease was executed when plaintiff could not present an NFR letter addressing the copper contamination.

The court accepted into evidence, over defendant's objection, plaintiff's real estate taxes, insurance, utility and maintenance expenses during the remediation period. Also accepted were the amounts paid for marketing expenses and those paid to Pioneer for cleanup. The court entered judgment against defendant in the amount of rent computed at $3.80 per square foot, plus real estate taxes, insurance, utility maintenance and environmental expenses during the 37-month period after the end of the lease. Defendant first claims that there was no breach of contract because: (1) defendant performed the June 24,

1996, agreement as written by taking "those steps [necessary] 'at the Premises' to remediate the copper" to below agency standards for industrial/commercial use; (2) "the trial judge erroneously added a provision to the contract requiring [defendant] physically to obtain a 'no further remediation' letter"; (3) even if an NFR letter was required, the only obstacle preventing the letter was plaintiff's conduct; and (4) the NFR letter issued to Pioneer on June 16, 1999, released defendant from all claims.

Defendant claims that the damages award is in error because it: (1) improperly computed damages from May 1996; (2) awarded damages after defendant had fully performed contractual obligations; (3) awarded damages for a time when the property would have been vacant anyway; and (4) did not account for plaintiff's failure to mitigate damages.

We first consider our standard of review. Defendant asks us to apply a *de novo* review. Defendant claims that, although the trial court received documentary exhibits and heard witnesses at trial, a *de novo* review is nevertheless appropriate because the trial court did not base its judgment on the credibility of witnesses. Defendant contends that the dispositive evidence consists solely of the June agreement, and the June 16 and July 7, 1999, agency letters.

■ *De novo* review is reserved for questions of law. *P.R.S. International, Inc. v. Shred Pax Corp.*, 184 Ill. 2d 224, 234, 703 N.E.2d 71 (1998). Construction of a contract is a question of law. *Gunthorp v. Golan*, 184 Ill. 2d 432, 704 N.E.2d 370 (1998). To the extent that this appeal requires us to construe the June 24, 1996, agreement, we will do so *de novo*. But the court here, in the course of an eight-day trial, where witnesses were heard and evidence received, made critical findings of fact relating to defendant's performance of the June 1996 agreement. The trial court said:

> "And [defendant] *did not take steps necessary* to enable it to obtain from the Illinois EPA a no-further remediation letter timely, referencing Paragraph 1. *** And, in fact, the owner, Plaintiff, never received *such* no-further-remediation letter, referencing Paragraph 2." (Emphasis added.)

Whether a party breached a contract is a question of fact that we review under a manifest weight of the evidence standard. *Meade v. Kubinski*, 277 Ill. App. 3d 1014, 1024, 661 N.E.2d 1178 (1996).

We address defendant's first two arguments in tandem. Defendant claims that it was only required "to take those steps necessary at the premises to enable it to obtain" an industrial/commercial NFR letter from the agency. Defendant claims that it did "take those steps" and that, by August 26, 1996, it had met the 82,000 mg/kg industrial/

commercial level required for an NFR letter under a tier 1 analysis. Defendant concludes that by August 26, 1996, it had completed its performance of the June 24, 1996, cleanup agreement. Defendant also claims that there was no requirement that it actually obtain an NFR letter. Defendant contends that "the trial judge, not the contract, required [it] to get 'the piece of paper.' " We strongly disagree.

■ Defendant's argument takes the plain language of the agreement and imposes upon it a meaning 180 degrees south of the words. Where, as here, no ambiguity exists, contract construction is a matter of law. *Gunthorp*, 184 Ill. 2d at 440. The plain and unambiguous words are applied as written. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479, 693 N.E.2d 358 (1998). Contracts are to be construed so as to further, not hamper, the intended purpose. *Schek v. Chicago Transit Authority*, 42 Ill. 2d 362, 364, 247 N.E.2d 886 (1969).

The agreement here reads: defendant is to "take those steps necessary to enable it to obtain" an NFR letter from the agency for industrial/commercial use standard. The next paragraph provides that defendant would not be released until "receipt of such 'no further remediation' letter." The trial court explained that this language meant defendant would not be released from its obligations until the letter was received:

> "And I think all the parties knew at the end of the day that a no-further-remediation letter in hand was the thing that was required *** because that made clear that everybody had everything that the law of Illinois requires to be done, and it would be recorded and would run with the land ***."

■ Under defendant's reading of the agreement, it was to be released from its obligations once defendant decided those steps necessary to qualify for an agency certification had been taken, without regard to whether the cleanup effort met agency standards or an NFR letter was ever issued. The interpretation is an interesting one: it leaves defendant in complete control of what amounts to performance under the agreement. We believe the language of the contract is clear to the contrary. Defendant had a dual obligation under the agreement: to clean up the property to qualify for an NFR letter and then actually obtain it. We believe defendant's attempt to clean up the property to its own satisfaction did not relieve defendant of its obligations to plaintiff. Defendant's obligations under the agreement did not end until plaintiff received an NFR letter.

Defendant alternatively argues that, even if a letter were required, it cannot be held liable for a breach where plaintiff hampered defendant's efforts to obtain the letter. Defendant claims that plaintiff's delay in signing the revised report delayed the agency review

process. Defendant also claims that plaintiff's own remediation efforts altered the conditions of the property such that, when the agency was prepared to issue the letter based on defendant's revised report, it could not.

■ Relying on *Lukasik v. Riddell, Inc.*, 116 Ill. App. 3d 339, 346, 452 N.E.2d 55 (1983), and *Barrows v. Maco, Inc.*, 94 Ill. App. 3d 959, 966, 419 N.E.2d 634 (1981), defendant correctly states that a party cannot take advantage of a condition precedent to thwart another party's attempts to comply with his contractual obligations. Defendant's argument hinges on a claim that the *"only* reason [it] did not ultimately obtain an NFR latter [*sic*] was that plaintiff, through Pioneer Environmental, had 'substantially changed' the conditions at the site." (Emphasis in original.) This argument is not a fair weighing of the evidence taken at trial. The evidence offered at trial showed plaintiff undertook to clean up its own property when it became clear, after two years, defendant was no closer to an NFR letter than it was in August 1996 when it poured a concrete barrier and concluded that the terms of the cleanup agreement had been met.

Huff's own testimony supports this assessment. The evidence at trial established that the copper chloride contamination had migrated laterally, not vertically. Huff admitted that cleanup of the sight was uncomplicated: it required excavation and removal of soil from the contaminated area. Huff said that core samples from near the excavated area showed concentrations of copper chloride, revealing that lateral migration was larger than the excavated area. Huff admitted that he did not enlarge the excavation to remove the contaminated soil. Huff also admitted that excavating the entire affected area would have resulted in removal of more than 90% of the copper which, as it so happens, is exactly what was ultimately done and resulted in an NFR letter. Huff opted instead to modify his report and suggest the use of an engineered barrier. Wayne Smith, a Pioneer employee, testified that this option was less expensive than breaching the newly poured concrete floor and resuming excavation.

■ Plaintiff took over remediation of the site in November 1998, more than two years after the June 24 agreement was executed. Plaintiff hired Pioneer to actively pursue an NFR letter. Pioneer completed this task in June 1999. The record shows that the agency then notified defendant in July 1999 that an NFR letter based on Huff's revised, and apparently still pending, report would not be issued because of changes at the site. It is clear from the record that the trial court finding that plaintiff's involvement in the remediation process did not take advantage of the condition precedent by delaying or preventing defendant from receiving an NFR letter is supported by the evidence.

■ Defendant next claims that the June 16, 1999, NFR letter issued to Pioneer triggered the release of claims in paragraph 2 of the agreement. We first note that defendant cites no case law in support of the novel argument that performance by a nonparty is sufficient to relieve the obligated party under a contract. The lack of citation ignores Supreme Court Rule 341(e)(7). 177 Ill. 2d R. 341(e)(7).

We turn to defendant's arguments against damages.

■ A trial court's assessment of damages will not be disturbed unless it is against the manifest weight of the evidence. *Meade v. Kubinski*, 277 Ill. App. 3d 1014, 1018, 661 N.E.2d 1178 (1996). A damage award is against the manifest weight of the evidence if the trial court ignores the evidence or the measure of damages is erroneous as a matter of law. *Meade*, 277 Ill. App. 3d at 1018.

■ Defendant first complains that the court improperly began computing damages from May 1996, before the June agreement was executed. But defendant failed to object to this computation at trial. Issues not raised at trial are waived and cannot be argued for the first time on appeal. *In re Marriage of Minear*, 181 Ill. 2d 552, 564, 693 N.E.2d 379 (1998).

■ Defendant next argues that the court erred in awarding damages after August 1996, when defendant claims to have fully performed all contractual obligations. The argument fails in light of our conclusion that the trial court did not err in finding that defendant had not fully performed by August 1996.

■ Next, defendant claims that the trial court awarded damages for a six-month vacancy that plaintiff admitted would have happened, even without the contamination. Defendant claims plaintiff was overcompensated by at least $75,000.

Defendant relies on Gearen's testimony. Gearen responded to a hypothetical question about how long it would take to lease property like the site at issue here, where the tenant leaves the property uncontaminated. Gearen said that it could take between zero and six months. He then admitted that, as of February 1996, plaintiff had no tenant.

The trial court did not believe this testimony justified a $75,000 credit for defendant. Defendant's argument overlooks the evidence that, without resort to a hypothetical, the property was uninhabitable until August 1996, because of the excavation work underway.

■ Defendant next contends that the judgment included damages caused by plaintiff's own delays and failure to mitigate damages. The duty to mitigate damages imposes a duty on the injured party to " 'exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted.' " *Tsoukas v.*

*Lapid*, 315 Ill. App. 3d 372, 377, 733 N.E.2d 823 (2000), quoting Black's Law Dictionary 904 (5th ed. 1979).

■ Defendant claims that plaintiff failed to mitigate damages by: (1) taking eight months to sign the revised report; (2) requiring defendant to include a chlorides analysis; (3) refusing to accept the June 1998 draft NFR letter; and (4) refusing to enter into the Display Graphics lease. Defendant argues that this "self-imposed" eight-month delay caused an additional $100,000 in damages, which should be deducted from the award. Defendant claims that Gearen's testimony shows he did not sign the revised report because of contamination concerns but to leverage other issues not relevant to this case. Defendant argues in his brief that "nothing else in plaintiff's evidence affords any plausible explanation for why it took plaintiff eight full months to get around to signing the NFR application." Defendant's argument overlooks the whole of Gearen's testimony.

Gearen did not testify that the *only* reason he did not sign the report was to gain leverage over defendant. He also voiced concern that Huff's conclusions had been substantially modified and that no further excavation work was done. Gearen explained:

"I was concerned about my acquiescing to this application, that it would mean that I agreed with it, which I didn't. So, I was concerned about the scope of the problem and did the application really fit what we were trying to accomplish."

The manner defendant chose to address plaintiff's objections to the report caused plaintiff's concern and decision to have the report reviewed by a third party. The evidence supports a finding that plaintiff's concerns were justified. The agency questioned the report from November 1997 until March 1999. In 1998, the agency said it would undertake a tier 3 analysis of the report. The analysis was still pending when Pioneer's report was considered and an NFR letter issued.

Defendant also claims that plaintiff caused a delay by insisting that a chloride analysis be included in the first report. We disagree. The record shows that the agency's standard for a restriction-free NFR letter included a requirement that copper contamination levels in the soil be addressed. Defendant cites no evidence to the contrary.

Defendant next argues that plaintiff failed to mitigate damages by refusing to accept the agency's draft NFR letter issued in June 1998. Plaintiff responds that there was no failure to mitigate because there was nothing to accept. We agree.

The agency did not issue an NFR letter in June 1998. The agency said that it "would likely issue" an NFR letter "similar to the attached draft NFR" that includes "most of the language that would be

included on a final NFR Letter for the remediation site." The draft contained an OSHA restriction. The final NFR letter would be subject to a pending tier 3 review by OCS of the contamination. The agency said it would not issue an NFR letter if it concluded that the contamination presented a threat to human health or environment. Defendant admits in its brief that "the construction worker issue was still under consideration in the Office of Chemical Safety, and that [the restriction] might be removed if the OCS agreed with Mr. Huff's Tier 3 analysis of construction worker exposure issues." Ultimately an NFR letter was not issued to defendant because Pioneer completed remediation and obtained an NFR letter while defendant's report was still pending.

Defendant cites no support for the argument that plaintiff's failure to "accept" the agency's draft NFR letter relieved defendant of its contractual obligations. We do not believe the contract may be so read. We believe that an NFR letter contemplated by the agreement was a formal one, not a draft.

Last, defendant complains that plaintiff could have reduced claimed damages by almost half if it had accepted the proposed Display Graphics lease. Defendant asks that the award be reduced by $200,000, representing rent, maintenance, utilities and insurance payments. Defendant also asks for $66,368.75, the amount Pioneer spent on remediation work. Defendant reasons that if the Display Graphics lease had been executed and the lease extended past the one-year term, the agency would have approved defendant's report and issued an NFR letter.

The proposed Display Graphics lease was to run from December 1997 to December 1998, with a one-year option to renew. In November 1997, Display Graphics sent plaintiff a nonbinding offer that set out the terms under which it would lease the property for one year. Mark Barbato, a real estate agent marketing plaintiff's property, admitted that plaintiff told Display Graphics it was waiting for an NFR letter and would not sign a lease until the letter was issued. Barbato also testified that Display Graphics was not interested in leasing the property until an NFR letter was issued. No NFR letter was issued by December 1997, so no lease was executed.

We do not believe it was unreasonable for plaintiff to tell a potential tenant that it was waiting for an NFR letter addressing contamination at the site before entering into a lease. Display Graphics' ultimate unwillingness to enter the lease without the letter demonstrates its importance.

The duty to mitigate will not be invoked as grounds for a hypercritical examination of a plaintiff's conduct. *Bank of Hillside v.*

*Laurel Motors, Inc.*, 259 Ill. App. 3d 362, 632 N.E.2d 183 (1994). Plaintiff was required to use reasonable diligence in minimizing its damages. *Tsoukas*, 315 Ill. App. 3d at 377. The trial court so found. The finding is supported by the evidence. The judgment of the trial court is affirmed.

Affirmed.

GORDON and COUSINS, JJ., concur.