2021 IL App (2d) 200210-U
No. 2-20-0210
Order filed October 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BRYAN E. BARUS, Trustee of the Bryan E. Barus Living Trust dated 01/02/02, derivatively on behalf of himself and on behalf of ROC/Suburban Two Woodland, LLC, | ) ) ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff-Appellant/Cross-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 11-CH-5145 |
| | ) | 18-L-1103 |
| | ) | 18-AR-1412 |
| | ) | |
| MICHAEL SIUREK and MICHAEL S. SIUREK, Trustee of the Michael S. Siurek Living Trust dated 09/30/02, | ) ) ) | |
| | ) | Honorable |
| | ) | Paul M. Fullerton, |
| Defendant-Appellee/Cross-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Bridges and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court's determination that both parties breached their fiduciary duty was not against the manifest weight of the evidence.  The trial court did not abuse its discretion in setting appropriate remedies for breach of fiduciary duty.  The trial court did not abuse its discretion in denying requests for attorney fees.

¶ 2   Bryan Barus, as trustee of the Barus Living Trust, and Michael Siurek, as trustee of the

Siurek Living Trust, were members and co-managers of ROC/Suburban Two Woodland, LLC

(RSTW), a manager-managed LLC. In 2011, Barus filed a complaint seeking to dissociate Siurek as a member of RSTW, and for the appointment of a receiver. In 2013, Siurek filed a counterclaim, alleging that Barus had breached his fiduciary duty and requesting both damages and that Barus's trust be dissociated as a member of RSTW. By the time of trial in 2019, RSTW's sole asset, a commercial office building. The issues at trial related to what amounts RSTW owed to Barus or Siurek in repayment of loans, management fees, commissions, and undistributed equity, and the total amount of RSTW's remaining assets for distribution. Following a bench trial, the trial court entered an order finding that both Barus and Siurek breached their fiduciary duties, setting forth the amounts owed to each of them in light of their conduct, and determining the amount of RSTW's remaining assets for distribution. Barus filed an appeal, and Siurek filed a cross-appeal, from this order. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Barus was the sole owner of Suburban Real Estate Services, Inc. (RES), a commercial real estate management company. Siurek was the sole owner of ROC, Inc. (ROC), a company also specializing in commercial real estate investments. Between 2006 and 2008, RES and ROC formed multiple new LLCs, including ROC/Suburban, LLC; ROC/Suburban Naperville (RSN); and RSTW. Barus and Siurek each owned 50% interest in ROC/Suburban. In 2010, Barus terminated RES's relationship with ROC/Suburban and took most of its employees. Siurek filed suit against Barus for breach of fiduciary duty (the 2010 suit). Siurek prevailed in that litigation.

¶ 5      RSTW's sole asset was a commercial office building located at 4951 S. Indiana in Lisle (the Two Woodland building). The property consisted of an approximately 55,000 square foot building on 4.76 acres of land. The property was acquired in June 2008 for a purchase price of $3,106,768. RSTW was managed by Barus and Siurek. The operating agreement specified that

the managers each had a 50% voting right and, therefore, they could not act unilaterally. The class A members of RSTW were the respective trusts of Barus and Siurek. There were multiple class B members/investors. Siurek, through ROC, maintained the records and accounts of RSTW, collected rents from the building, and was responsible for the finances and the physical condition of the building. Barus, through RES, managed the building and was responsible for finding tenants, leasing, marketing, and facility maintenance. In addition to RSTW, Barus and Siurek's trusts owned a similar company, RSN, that owned a commercial office building at 1804 Naper Boulevard in Naperville (the Naperville building). Barus and Siurek were also class A members and managers of RSN.

¶ 6    On October 28, 2011, Barus filed suit against Siurek. The complaint alleged that Siurek failed to provide his half-share of the 2010 first and second installment property taxes for the Two Woodland building and was occupying office space at the building rent-free. The complaint also alleged that Siurek failed to produce timely monthly financial reports for RSTW and restricted Barus's access to company data files. Barus sought to have Siurek's trust dissociated as a member of RSTW (see 805 ILCS 180/35-45 (West 2010)), or, alternatively, the appointment of a receiver (see 735 ILCS 5/2-415 (West 2010)).

¶ 7    On September 4, 2012, Barus filed an amended complaint. Barus alleged that it was not until he filed suit in October 2011 that Siurek finally paid his share of the real estate property taxes. However, the late payment resulted in penalties and late fees which Siurek refused to pay. Further, in 2012, Siurek told Barus that he had paid the first installment property taxes. However, Barus checked, and they were not paid. Siurek paid the taxes when Barus confronted him. Barus also alleged that Siurek had removed receivables from the company's records, allowed a friend to occupy space rent-free, and that Siurek paid ROC for unusual and unapproved charges. Barus

alleged that Siurek continued to restrict his access to company financial data and operational documents, making it difficult for Barus to manage the company and identify other acts of Siurek's self-dealing.

¶ 8    On November 12, 2013, Siurek filed a counterclaim alleging that Barus breached his fiduciary duty to Siurek and RSTW. Specifically, Siurek alleged that Barus had initiated frivolous and unnecessary litigation, defamed the reputation and professional standing of Siurek, delayed the refinancing of the Two Woodland building resulting in additional financing costs, refused to accept or unduly delayed acceptance of leases for Two Woodland, demanded unwarranted lease commissions, refused to approve payment for tenant improvements, caused ROC to abruptly vacate office space at Two Woodland, and failed to pay rent for office space occupied by RES at Two Woodland. The counterclaim requested damages and that Barus's trust be dissociated as a member of RSTW (see 805 ILCS 180/35-45 (West 2010)).

¶ 9    On April 27, 2017, Siurek filed an amended counterclaim. In addition to the allegations in the original complaint, Siurek alleged that, at the time Barus filed suit, the mortgage loan on the Two Woodland building was up for renewal. Siurek alleged that Barus knew the lawsuit would render refinancing of the loan difficult or impossible and that Barus's refusal to drop the lawsuit resulted in additional costs and fees. The amended counterclaim requested that Barus's trust be dissociated as a member of RSTW (see 805 ILCS 180/35-45 (West 2010)), and a finding that Barus's conduct breached the operating agreement and his fiduciary duty as a manager of RSTW.

¶ 10   Two other cases were consolidated with this case in the trial court, case Nos. 18-L-1103 and 18-AR-1412. Case No. 18-L-1103 was a case filed by ROC against RSTW. ROC alleged that it had provided construction, property management, maintenance services, and construction supervision to RSTW and that it had not been paid for all its services. ROC requested judgment

against RSTW for the value of the work performed by ROC. Case No. 18-AR-1412 was a case filed by RES against RSTW. RES alleged that it had provided property management services to RSTW and performed construction services for which it had not been paid. RES also alleged that it had acted as a tenant broker on a lease between RSTW and Augmentity and that it had not been paid its $50,000 commission. RES requested judgment against RSTW for these amounts.

¶ 11 The Two Woodland building was sold on April 11, 2017. On June 15, 2017, the trial court entered a payout order to allow the class B members to receive a portion of their invested funds, to pay creditors that Barus and Siurek agreed upon, and to allow Barus and Siurek to receive a percentage of the funds. The distribution of the remaining funds was at issue in the trial. On April 15, 2019, the trial court granted Barus's motion to voluntarily dismiss his amended complaint.

¶ 12 A bench trial was conducted over four days in June 2019. Siurek testified that early on, when RSTW needed to do improvements for new tenants, RSTW would take a loan from the bank who held the mortgage. Eventually, the loan availability ran out so he and ROC would fund initial buildouts for tenants. The loan from Siurek/ROC was then shown as a payable on RSTW's books. The record indicates that Barus and Siurek also advanced funds to RSTW to pay real estate property taxes.

¶ 13 Siurek further testified that, starting in 2008, ROC/Suburban leased a space in the Two Woodland building and paid rent. After Barus terminated RES's relationship with ROC/Suburban in June 2010, Siurek/ROC moved out of Suite 450 at Two Woodland, which he occupied with Barus/RES. He moved to another suite in the building, where he was a subtenant and paid rent to the tenant. Barus/RES did not pay rent for Suite 450 and moved out in April 2011. ROC/Suburban paid rent on Suite 450 until November 2010.

¶ 14    Siurek testified that, in January 2011, after ROC/Suburban was dissolved, Barus stopped being cooperative in terms of managing RSTW. Barus stopped providing information, was disruptive, and seized bank accounts. There was a lot of stalling and inaction. This was very detrimental because, at the time, the Two Woodland building was virtually vacant and RSTW was managing cash flow on a week-to-week basis.

¶ 15    Siurek further testified that, in September 2011, Barus proposed a new tenant for Two Woodland, Augmentity. Barus proposed giving them 11,500 square feet of space, but only charging them rent on 8500 square feet. Barus also based his commission on the 11,500 square feet of space. Siurek testified that there was a space of 8900 square feet available. Barus refused to tell Siurek why he was giving Augmentity the extra space. At that time, Siurek moved ROC to Suite 460 in the Naperville building to make room for Augmentity. Siurek told Barus that his commission would need to be approved by the lender and the other investors. Barus was asking for a $50,000 commission. Barus never attempted to get approval for the commission. Siurek was proposing that the commission be paid in installments due to RSTW's cash flow problems. He had proposed a 24-month installment schedule. He and Barus never reached an agreement. Siurek testified that the payment of the commission was in installments because it was meant to tie with the cash flow from Augmentity's rent. When Augmentity went out of business and stopped paying rent after 11 months, Siurek believed the commission payments were meant to cease also.

¶ 16    Siurek also testified that, after Barus filed suit in October 2012, Siurek became concerned about being removed as a manager and worried about RSTW's mortgage loan that was up for renewal. The lender cautioned them about the litigation and expressed that it was hesitant to grant a loan renewal. Siurek testified that he never withheld financial information from Barus. Barus received monthly financial statements for RSTW and Siurek directed his employees to give Barus

any reports he requested. Siurek did not give Barus direct access to his financial system because Barus had already stolen it once, in 2010. Siurek's financial system had information for multiple properties, not just the ones he and Barus owned together. His information technology department recommended against giving Barus direct access to the system.

¶ 17 Siurek testified that when Augmentity moved in, there were broken floor tiles in the kitchen of the office space. Replacing the tile floor was not part of the original buildout agreement with Augmentity. Nonetheless, Siurek repaired the broken floor tiles. Augmentity was unsatisfied with the repair and wanted the entire floor replaced. Augmentity broke the tiles when they moved in, so Siurek did not believe RSTW should be responsible for replacing the whole floor. Siurek saw the repairs and the floor looked fine to him. Siurek later learned that Barus authorized Augmentity to replace the whole floor and gave it a rent credit to cover the cost. Siurek did not approve the floor replacement or the rent credit.

¶ 18 On cross-examination, Siurek reiterated that he never agreed to an Augmentity lease commission for Barus. Siurek acknowledged that Barus sent him an email that RES would be paid $50,000 in equal installments over 24 months and that he responded "yes" to the email. On May 1, 2017, he sent an email to Barus about proposed distribution of sale proceeds from the building. Siurek suggested that he and Barus not get paid their $66,500 management fees until all of the equity was returned to the investors. By the time of trial, Siurek agreed that he and Barus should be paid for their management fees.

¶ 19 Barus testified that after ROC/Suburban was dissolved, he turned over the financial management system server, called Skyline, to Siurek. Barus testified that he and Siurek agreed that each would have unfettered access to the financial information related to properties that they still co-managed. However, Siurek later did not allow him access to all the financial information.

It would have been possible for him to just receive permissions to access certain data on the Skyline system, but Siurek would not agree to this. After 2010, he was not receiving financial documents regularly. This is the reason he filed the present lawsuit in October 2011. After he filed the lawsuit, he started receiving financial documents more regularly. Barus acknowledged that in the 2010 suit, the trial court (Judge Sheen) found that Barus had no legitimate claim to the Skyline server and data.

¶ 20    Barus acknowledged that when he filed suit, he knew that the mortgage loan was up for renewal and that the lender would not be happy. Barus acknowledged that the lender and many of the investors had a history with Siurek. He denied filing suit to cause personal problems for Siurek. Barus acknowledged that, in his complaint, he alleged that Siurek was not paying property taxes, but he also testified that Siurek had no obligation to pay the taxes out of his own pocket. He acknowledged that his complaint alleged that Siurek was staying at Two Woodland rent-free but admitted that this allegation was included in error. Siurek was a subtenant and paying rent to the tenant. Further, even though he alleged in his complaint that Siurek was withholding financial information, Barus acknowledged that he never sought a court order to get access to any financial information. He did not come to court to ask for data until 2019, two years after the Two Woodland building was sold.

¶ 21    Barus acknowledged that he remained in Suite 450 at the Two Woodland building until March 2011. However, Barus and RES did not have a lease on the space, it was still leased to ROC/Suburban. Barus testified that he did not stay there rent-free because ROC/Suburban still owed RSTW for the rent that was unpaid.

¶ 22    Barus testified that Siurek was in full agreement with giving Augmentity more space than it was paying rent for. It was a lucrative lease and without the extra space, they were worried they

would lose Augmentity. Barus testified that Siurek agreed to his being paid $50,000 on the Augmentity commission over a 24-month period beginning on execution of the lease. The commission should have been closer to $100,000 but RES agreed to a lower commission due to RSTW's cash flow issues. Barus testified that he looked at the floor repairs in the Augmentity space and he did not think the repairs were acceptable. Barus denied giving Augmentity permission to repair the floor at RSTW's expense. Either Siurek or RES's property manager, Pam Newman, approved it. Barus testified that he would not have allowed Augmentity to make the repair if Siurek had not agreed.

¶ 23    Pam Newman testified that she was the property manager for Two Woodland in 2012. Siurek had originally told her that ROC was going to fix Augmentity's kitchen floor. Later she found out that ROC was not going to fix the kitchen floor. She had to scramble to find a contractor to do it. Augmentity had just moved in and was angry that it was taking so long to get the floor done. She believed that both Barus and Siurek had approved of her taking care of Augmentity's complaints about the kitchen floor. Newman identified Plaintiff's Exhibit 22, an email from Augmentity's CEO, written to Barus and Newman, thanking them for replacing the kitchen floor. On cross-examination, Newman testified that she did not think that the tenant improvements promised in the Augmentity lease included a new kitchen floor. She did not know that Siurek did not approve replacing the kitchen floor. Newman admitted that she never spoke to Siurek directly about the issue. She also testified that she did not know who approved the rent-credit for the Augmentity floor repairs, and she did not remember if she was the person who approved it.

¶ 24    On December 27, 2019, the trial court entered a written order. The trial court found that both Barus and Siurek breached their fiduciary duties to RSTW and to each other. Further, each had acted in a manner that was clearly designed to hurt the other party, which was not in the best

interest of RSTW or its investors. The trial court ordered that both Barus and Siurek be repaid for the personal loans they made to RSTW and be paid their management fees of $66,500, which were earned until the building was sold. The trial court further found that they should be paid interest on their loans through the date the building was sold, April 11, 2017, and not through the date of judgment. As to interest on the management fees, the trial court stated "Siurek agreed to waive interest (stopping as of date of sale-4/1/17 [*sic*] and the Court agrees." As to the commission on the Augmentity lease, the trial court noted that Augmentity initially signed a 36-month lease but left after only 11 months. Barus had argued that he was due the full commission ($50,000) plus interest (for a total of $67,722.32). The trial court found that Barus was only due a commission on a pro-rata basis for the 11 months of occupancy, totaling $13,793. Finally, the trial court found that Barus had given an improper rent credit of $5786.58 to Augmentity and ordered that Barus pay this amount. After calculating RSTW's total remaining assets for distribution based on these findings, the trial court ordered that a distribution be made according to RSTW's members' class and ownership percentage. Finally, the trial court found that Barus and Siurek were each responsible for their own attorney fees.

¶ 25    Barus filed a motion to reconsider arguing, in part, that the trial court erred in calculating interest through the date of sale on the deferred management fees. Specifically, Barus argued that each party was owed $76,986.58. Barus noted that while the trial court stated that it was stopping interest as of the date of sale, the $66,500 payout included no interest at all. Barus further argued that, because the failure to pay the management fees in 2017 when the building was sold was due to Siurek's objection, he (Barus) was entitled to interest until the date of judgment. Barus also argued that the trial court erred in calculating the amount due for the Augmentity commission.

Specifically, that the pro rata amount for 11 months of a 24-month lease on a commission of $50,000, was $22,916.67.

¶ 26    Siurek filed a motion to approve distribution of RSTW's assets and included a distribution schedule that was consistent with the trial court's December 2019 order. Barus filed a response, arguing that distribution was premature as there were post-judgment motions pending and the matter could still be subject to modification in the appellate court. Barus agreed, however, to certain payments to creditors.

¶ 27    On March 9, 2020, the trial court granted Barus's motion for reconsideration in part and denied it in part. The trial court agreed that $22,916.67 was the appropriate amount due for the Augmentity commission. The trial court denied Barus's request for interest on the management fees. The trial court found that both parties breached their fiduciary duty and that an award of interest would essentially be rewarding them for that conduct and for dragging this litigation on for eight years. The trial court granted Siurek's motion for distribution. Thereafter, Barus filed a timely notice of appeal and Siurek filed a timely notice of cross-appeal.

¶ 28                        II. ANALYSIS

¶ 29                        A. Motion to Dismiss

¶ 30    At the outset, we note that Siurek filed a motion to dismiss this appeal which was ordered to be taken with this case. In the motion to dismiss, Siurek argues that because Barus accepted his distribution checks on behalf of himself and RES, and did not seek to stay the December 2019 judgment, he forfeited his right to appeal that judgment. Further, as all of RSTW's assets have been distributed, Siurek argues that this appeal is moot.

¶ 31    It is well-established that an appeal is moot when it involves no actual controversy, or the reviewing court cannot grant the complaining party effectual relief. *Steinbrecher v. Steinbrecher*,

197 Ill. 2d 514, 527-28 (2001). Further, where supervening events make it impossible for a reviewing court to grant relief to any party, the case is rendered moot because an appellate ruling on the issue cannot have any practical legal effect on the controversy. *In re Tekela*, 202 Ill. 2d 282, 292-93 (2002). Accordingly, a reviewing court ordinarily will not decide a moot issue. *People ex rel. Sklodowski v. State*, 162 Ill. 2d 117, 130 (1994).

¶ 32 Siurek relies on "the general rule in civil cases that when a judgment has been voluntarily paid or its benefits accepted the question becomes moot." *Cook County v. Malysa*, 39 Ill. 2d 376, 379 (1968). Siurek's reliance on *Malysa* is unpersuasive. *Malysa* involved an eminent domain judgment, which "merely establishes a value that [the condemnor] must pay to acquire title" and "[t]he condemnor is under no compulsion to pay the award." *Id.* The *Malysa* court thus held that because the condemnor voluntarily paid the award and accepted title to the property, it forfeited any contentions of error in the original proceeding. *Id.* at 381.

¶ 33 Siurek argues that this case is similar to *Malysa* in that, although the trial court approved the motion to distribute, RSTW was not obligated to disburse the funds. Siurek insists that the funds were only disbursed because Barus voluntarily agreed to the disbursement. This assertion is belied by the record. Barus objected to the motion to distribute, and the trial court granted the motion to distribute over that objection. The record also indicates that Barus raised objections to distribution with Siurek post-judgment. Thus, Barus did not voluntarily agree to the subsequent disbursement, it was authorized by court order.

¶ 34 Siurek also relies on Illinois Supreme Court Rule 305(k) (eff. July 1, 2017). Siurek argues that Rule 305(k) moots the appeal because Barus failed to obtain a stay and all of RSN's assets have been distributed. Rule 305(k) protects third-party purchasers of a property from "reversal or modification of the judgment" regarding that property if: "(1) the property passed pursuant to a

final judgment; (2) the right, title and interest of the property passed to a person or entity who is not part of the proceedings; and (3) the litigating party failed to perfect stay of judgment within the time allowed for filing a notice of appeal." *Steinbrecher*, 197 Ill. 2d at 523-24 (interpreting Rule 305(j), which is now Rule 305(k)). As this case does not involve third-party purchasers, it is questionable whether this rule even applies in this case. However, even if it were applicable, we would still find Siurek's reliance on it unpersuasive because the second requirement has not been met. Here, the property passed to Barus, Siurek, and to RSTW's class B members. While RSTW's class B members are not parties to this suit, Barus and Siurek are parties. Thus, this court could order relief to the extent any funds were improperly distributed to Barus or Siurek. See *Columbia Mutual Insurance Co. v. Herrin*, 2012 IL App (5th) 100037, ¶ 11 (the distribution of judgment proceeds, made over the objection of an appellant, does not render an appeal moot because the appellee could be required to make restitution). Accordingly, we cannot conclude that this appeal is moot, and we deny Siurek's motion to dismiss this appeal.

¶ 35                                    B. Barus's Appeal

¶ 36    On appeal, Barus first argues that the trial court erred in denying the payment of interest on the management fees and the loans through the date of judgment. Barus notes that the loan agreements included an obligation to pay interest until the date the loans were repaid. Further, RSTW's operating agreement required that interest be paid on the management fees. Barus argues that the trial court did not have the ability to rewrite the contracts. This contention is without merit because the trial court did not rewrite the contracts. The trial court noted that both parties breached their fiduciary duty. Cutting off the interest on the loans as of the date of sale and denying interest on the management fees was damages for the parties' breach of fiduciary duty. It is well settled that the appropriate remedy for a breach of fiduciary duty is within the equitable discretion of the

- 13 -

trial court. *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 53. Barus has failed to cite any authority for the proposition that denial of interest as a remedy for the parties' breach of fiduciary duty was improper.

¶ 37     Barus further argues that, even if the trial court did not rewrite the contracts, its determination was against the manifest weight of the evidence. The issue of damages is a question of fact and a trial court's finding of damages will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 607 (1999). A damage award is against the manifest weight of the evidence only where it is apparent that " 'the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law.' " *Id.* at 607 (quoting *Meade v. Kubinski*, 277 Ill. App. 3d 1014, 1018 (1996)). "[A] fiduciary may not retain any profits obtained through a breach of duty." *Regnery v. Meyers*, 287 Ill. App. 3d 354, 364 (1997).

¶ 38     Barus argues that the evidence showed that the day after the property was sold, he proposed paying RSTW's creditor claims, including the loans and the management fees. However, Siurek refused to pay these claims and thus the claims had to be resolved at trial. Because Siurek caused the delay, Barus argues that the trial court erred in concluding that Barus had anything to do with the delay and should have awarded Barus interest on the loans and management fees through the date of judgment.

¶ 39     In so arguing, Barus relies on an April 12, 2017, email he wrote to Siurek, suggesting that the loans and management fees be distributed. Siurek agreed that each were owed for their personal loans and management fees but argued that the investors' notes and the investors' capital should be paid out first. Thus, the emails do not show that Siurek refused to pay the subject loans and fees, but that there was a dispute between the parties over the priority of distributions. More

importantly however, based on the record before us, we cannot say that the trial court's determination that both parties breached their fiduciary duty by failing to act in the best interest of RSTW was against the manifest weight of the evidence. Further, Barus fails to cite any authority for the proposition that the denial of interest on the management fees and the loans was not a proper remedy for his breach. Accordingly, we affirm the trial court's determination on this issue.

¶ 40    Barus next argues that the trial court erred in failing to award him the full $50,000 for his Augmentity commission and not providing interest on that amount as required under the operating agreement or under section 205/2 of the Interest Act (815 ILCS 205/2 (West 2018)). We cannot say that the trial court's determination was against the manifest weight of the evidence. The evidence showed that there was no written agreement to this specific lease commission. Further, Siurek testified that he, as a manager of RSTW, and due to RSTW's poor financial situation, agreed only to a $50,000 commission paid over 24 months from the cash flow generated by the Augmentity lease. Siurek further testified that, when Augmentity went out of business and stopped paying rent after 11 months, the cash flow, and the commission, ceased. Barus argues that Siurek testified that broker commissions are earned when a lease is signed. While Siurek did so testify, that testimony did not address the amount or manner in which a commission would be paid.

¶ 41    As to whether there should have been interest awarded on the commission, Barus has failed to cite authority for the proposition that he is entitled to statutory prejudgment interest under the circumstances in this case and has failed to cite to the section of the operating agreement that would support a payment of interest. Accordingly, this claim for interest is forfeited. See *Mack v. Viking Ski Shop, Inc.*, 2014 IL App (1st) 130768, ¶ 17 (a reviewing court is entitled to clearly defined issues, cohesive legal arguments, and citations to relevant authority). Even absent

forfeiture, we cannot say that the failure to award interest on the commission was not a proper remedy for Barus's breach of fiduciary duty. *Fieldcrest Builders*, 311 Ill. App. 3d at 607.

¶ 42    Barus next argues that the trial court erred in denying his request for attorney fees. Barus argues that, under RSTW's operating agreement, he is entitled to be reimbursed for expenses he incurred for the benefit of RSTW, namely, the attorney fees incurred due to the litigation. Barus relies on section 13.12 of the operating agreement, which states that RSTW should reimburse managers for "reasonable costs advanced to or paid for the benefit of the [RSTW]," and section 19.1, which states that RSTW should indemnify managers for expenses related to business activities provided that the manager was "not guilty of gross negligence or willful misconduct and [was] acting in good faith." Whether and in what amount to award attorney fees is in the trial court's discretion, and we review the trial court's decision for an abuse of that discretion. *Thomas v. Weatherguard Construction Co.*, 2018 IL App (1st) 171238, ¶ 61.

¶ 43    The trial court did not abuse its discretion in denying Barus's request for attorney fees. Barus has failed to demonstrate on appeal that the trial court erred in finding that he breached his fiduciary duty to RSTW. The trial court specifically found that, over the eight years of litigation, Barus was not acting in the best interest of RSTW but was motivated by a desire to harm Siurek. Accordingly, because Barus was not acting in good faith or for the benefit of RSTW, he was not entitled to attorney fees under the operating agreement.

¶ 44    Finally, Barus argues that the trial court erred in entering judgment against him for the $5,768.58 rent credit he gave to Augmentity to replace part of the floor in its suite. Barus argues that the uncontested evidence was that Newman, not Barus, ordered the work, she had the authority to do so as property manager, and that the credit did not cause any damages, as the charges for the work were at fair market value.

¶ 45    We disagree with Barus's portrayal of the evidence. Newman testified that she acquired a vendor to complete the floor because she believed that both Siurek and Barus had wanted her to do so. She admitted that she never spoke to Siurek directly. She also testified that she did not know who approved the rent-credit for the floor replacement and did not remember if she was the person who approved it. Siurek testified that he did not approve replacing the whole floor because the Augmentity lease did not require the floor to be replaced. Newman corroborated that the Augmentity lease did not include a whole new floor. Emails between Siurek and Newman addressing floor repairs are unclear as to whether they are addressing replacing a few floor tiles or the entire floor. There is also an email from the Augmentity CEO thanking Barus and Newman for completing the floor replacement. Based on this evidence, the trial court concluded that Barus approved the work and the rent credit. Such a conclusion was not against the manifest weight of the evidence. *Poulakis v. Taylor Rental Car Center, Inc.*, 209 Ill. App. 3d 378, 383 (1991) (the trial court may draw reasonable inferences from the evidence). Further, it is undisputed that RSTW's operating agreement did not allow for a manager to make unilateral decisions. Accordingly, as Barus breached the operating agreement by unilaterally granting the rent credit, we cannot say the trial court erred in entering judgment for that expense against Barus.

¶ 46                    C. Siurek's Cross-Appeal

¶ 47    On cross-appeal, Siurek argues that the trial court erred in not reimbursing him for the attorney fees he incurred in this suit. Siurek argues that, because Barus withdrew his complaint prior to trial, whether Siurek breached his fiduciary duty was not an issue ripe for adjudication by the trial court. Siurek further argues that his action against Barus benefitted RSTW in that Barus was denied interest on amounts owed to him, Barus's Augmentity commission was reduced, Barus was ordered to reimburse RSTW for the Augmentity floor replacement, and Barus was denied his

request to be indemnified by RSTW for his attorney fees. We review the trial court's decision, denying Siurek's request for attorney fees, for an abuse of discretion. *Thomas*, 2018 IL App (1st) 171238, ¶ 61.

¶ 48    The trial court's determination was not an abuse of discretion. As noted earlier, the operating agreement provided that RSTW should reimburse managers for "reasonable costs advanced to or paid for the benefit of the [RSTW]," and that RSTW should indemnify managers for expenses related to business activities provided that the manager was "not guilty of gross negligence or willful misconduct and [was] acting in good faith." As with Barus, the trial court found that Siurek, over the eight years of litigation, was not acting in the best interest of RSTW and was motivated by a desire to harm Barus. Regardless of whether a formal finding that Siurek breached his fiduciary duty was necessary once Barus withdrew his complaint, there was sufficient evidence to support the trial court's determination that Siurek was not acting in RSTW's best interest. This was a sufficient basis to deny Siurek's request for attorney fees under the operating agreement. Although Siurek's suit may have had some minor benefits to RSTW, it is not enough for us to hold that the trial court abused its discretion.

¶ 49                                    III. CONCLUSION

¶ 50    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 51    Affirmed.